**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 10 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

DOUGLAS CAMPBELL, RICHARD
HAMILTON, CLYDE HARKINS,
JACK HAWKINS, DANIEL HAYES,
GARY SWING, JEFFREY WRIGHT,
DOUGLAS BRUCE, THE
INITIATIVE AND REFERENDUM
INSTITUTE, AMERICANS FOR
SOUND PUBLIC POLICY, and the
AMERICAN CONSTITUTIONAL
LAW FOUNDATION, INC.,

        Plaintiffs - Appellants,

    v.

VICTORIA BUCKLEY, in her official
capacity as Secretary of State for the
State of Colorado and member of the
Colorado State Initiative and
Referendum Title Board, COLORADO
STATE INITIATIVE AND
REFERENDUM TITLE BOARD, and
RICHARD WESTFALL and
REBECCA LENNAHAN in their
official capacities as Title Board
members,

        Defendants - Appellees.

No. 98-1329

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 98-K-1022)

---

Paul Grant, Parker, Colorado, for Plaintiffs-Appellants.

Maurice Knaizer, Deputy Attorney General (Ken Salazar, Attorney General; Barbara McDonnell, Chief Deputy Attorney General; Michael E. McLachlan, Solicitor General; Christine M. Arguello, Deputy Attorney General, with him on the brief), Denver, Colorado, for Defendants-Appellees.

---

Before **BRISCOE** , **REAVLEY** [*], and **MURPHY** , Circuit Judges.

---

**REAVLEY** , Senior Circuit Judge.

---

Eight individuals and three organizations [1] brought this action challenging the constitutionality of the "title setting" requirements of the State of Colorado's

---

[*]Honorable Thomas M. Reavley, United States Senior Circuit Judge for the Fifth Circuit, sitting by designation.

[1] The three institutional plaintiffs challenge the district court's holding that they lacked standing. Because the individual plaintiffs are proponents of past and present initiatives and have standing, and because all plaintiffs are represented by the same counsel and jointly raise the same substantive arguments on appeal, we decline to address the standing issue. In these circumstances there is no need to address the standing of the institutional plaintiffs, see Bowsher v. Synar, 478 U.S. 714, 721 (1986); Secretary of the Interior v. California, 464 U.S. 312, 319 n.3 (1984), particularly where, as here, these plaintiffs have not obtained relief different from that of the plaintiffs who do have standing, see General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 402 n.22. (1982).

ballot initiative law. The district court, after a bench trial, upheld the constitutionality of the Colorado scheme. [2] We affirm.

## BACKGROUND

The Colorado Constitution reserves to the people the power to enact laws and constitutional amendments by initiative, and to reject by referendum laws passed by the general assembly. [3] An initiative is placed on the ballot after the proponent secures by petition the required number of signatures by registered electors. [4] A referendum similarly may be placed on the ballot by circulating a petition, or may be placed on the ballot by the general assembly. [5] Initiatives and referenda placed on the ballot and approved by majority vote are not subject to the governor's veto power. [6]

Colorado has various procedures, set out in its constitution and statutes, which regulate initiatives. "The Colorado Constitution grants the general

---

[2] Campbell v. Buckley, 11 F. Supp.2d 1260 (D. Colo. 1998).

[3] See Colo. Const. art. V, § 1(1).

[4] For the initiative to be placed on the ballot, the petition must be signed by registered electors equal in number to at least five percent of the total number of votes cast for the office of secretary of state in the previous election. See id. art. V., § 1(2). A "registered elector" is a person legally qualified to vote who has complied with state registration provisions. See Colo. Rev. Stat. § 1-1-104(12) & (35) (1999).

[5] See Colo. Const. art. V, § 1(3).

[6] See id. art V, § 1(4).

-3-

assembly the authority to adopt legislation designed to prevent fraud, mistake, or other abuses in the petition process." [7]

Appellants challenge the "title setting" requirements of the ballot initiative procedure. Under these requirements, initiatives must comply with a "single subject" rule, and are given a title and summary by state officials before the petition is circulated. Under Art. V., § 1(5.5) of the Colorado Constitution:

> No measure shall be proposed by petition containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any measure which shall not be expressed in the title, such measure shall be void only as to so much thereof as shall not be so expressed. If a measure contains more than one subject, such that a ballot title cannot be fixed that clearly expresses a single subject, no title shall be set and the measure shall not be submitted to the people for adoption or rejection at the polls.

This provision was added to the Colorado Constitution by constitutional amendment approved by the voters in 1994.

Similar single subject requirements apply to bills and constitutional amendments proposed by the general assembly, other than general appropriations bills.[8]

---

[7] American Constitutional Law Found., Inc. v. Meyer, 120 F.3d 1092, 1096 (10th Cir. 1997) (internal quotation marks omitted), aff'd sub nom. Buckley v. American Constitutional Law Found., Inc., 119 S. Ct. 636 (1999). We refer to both decisions as "ACLF."

[8] See Colo. Const. art. V, § 21 ("No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title . . . ."); id. art. XIX, § 2(3) ("No measure proposing an

(continued...)

By statute, the proponent of a ballot initiative must submit a draft of the initiative petition to the directors of the state legislative council and the office of legislative legal services for review and comment.[9] The proponent may amend the petition in response to these comments.[10] "To the extent possible, drafts shall be worded with simplicity and clarity and so that the effect of the measure will not be misleading or likely to cause confusion among voters."[11] The draft is then submitted to the secretary of state.[12] The "title board," consisting of the secretary of state, attorney general, and director of the office of legislative legal services or the director's designee, then gives the initiative a "proper fair title," a submission clause, and an impartial summary.[13] The petition cannot be circulated for the required signatures unless these procedures are followed.[14] If the proponent is

---

[8](...continued)
amendment or amendments to this constitution shall be submitted by the general assembly to the registered electors of the state containing more than one subject, which shall be clearly expressed in its title . . . .").

[9] See Colo. Rev. Stat. § 1-40-105(1) (1999).

[10] See id. § 1-40-105(2).

[11] Id. § 1-40-105(3).

[12] See id. § 1-40-105(4).

[13] See id. § 1-40-106(1) & (3). The submission clause is "the language which is attached to the title to form a question which can be answered by 'yes' or 'no.'" Id. § 1-40-102(8).

[14] See id. § 1-40-107(4).

dissatisfied with the title, submission clause, or summary, he may move for rehearing with the title board, and if rehearing is overruled, he may seek review in the Colorado Supreme Court.[15]

The reasons for the title setting requirements are described by statute:

> (d) The Colorado supreme court has held that the constitutional single-subject requirement for bills was designed to prevent or inhibit various inappropriate or misleading practices that might otherwise occur, and the intent of the general assembly in referring to the people section 1(5.5) of article V and section 2(3) of article XIX was to protect initiated measures and referred constitutional amendments from similar practices;
> (e) The practices intended by the general assembly to be inhibited by section 1(5.5) of article V and section 2(3) of article XIX are as follows: (I) To forbid the treatment of incongruous subjects in the same measure, especially the practice of putting together in one measure subjects having no necessary or proper connection, for the purpose of enlisting in support of the measure the advocates of each measure, and thus securing the enactment of measures that could not be carried upon their merits; (II) To prevent surreptitious measures and apprise the people of the subject of each measure by the title, that is, to prevent surprise and fraud from being practiced upon voters.[16]

Appellants alleged in their complaint that the statutory scheme, on its face, violates their federal constitutional rights under the First and Fourteenth Amendments "to speech, petitioning, political association, due process and voting." The complaint also alleged that as applied the single subject requirement had been used to thwart their efforts to submit legislative and constitutional

---

[15] See id. § 1-40-107(1) & (2).

[16] Id. § 1-40-106.5

changes to the voters. For example, they alleged that their proposed initiatives for tax reform and selection of judges had been kept off the ballot by opponents who, in a subjective, arbitrary, and discriminatory manner, found violations of the single subject requirement. The district court heard testimony at the trial, and also incorporated testimony previously given at a hearing on appellants' application for a preliminary injunction.

After considering the arguments of the parties and the evidence, the district court held that the Colorado initiative procedures challenged by appellants did not violate federal constitutional standards.

DISCUSSION

Appellants argue that the title setting process abridges their First Amendment rights. We have recognized that "even though the initiative and referendum process is not guaranteed by the United States Constitution, Colorado's choice to reserve it does not leave the state free to condition its use by impermissible restraints on First Amendment activity." [17]

The Supreme Court and this court have written extensively on the federal constitutional requirements placed on states when they regulate the voting process. As we detail here, precedent requires that our analysis turn in large

---

[17] ACLF, 120 F.3d at 1100.

measure on whether the regulation at issue is subject to a balancing test or strict scrutiny.

A.    The Balancing Test

The Supreme Court has employed a flexible approach, which we refer to as the balancing test, in a number of cases involving state regulation of the voting process. In Anderson v. Celebrezze,[18] the Court struck down a state filing deadline for independent candidates, but in so doing recognized that constitutional challenges to a state's election laws

> cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.[19]

In Burdick v. Takushi,[20] a voter challenged a state ban on write-in voting, on grounds that the ban violated his right to vote under the First and Fourteenth

---

[18] 460 U.S. 780 (1983).

[19] Id. at 789 (citation omitted).

[20] 504 U.S. 428 (1992).

Amendments.   In upholding the ban, the Court held that strict scrutiny was not required, and that instead a balancing test was in order:

> Petitioner proceeds from the erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny. . . . Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. . . . Consequently, to subject every voting regulation to strict scrutiny . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently. . . . Instead . . . a more flexible standard applies.  A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden  imposed by its rule, taking into consideration the extent to which those  interests make it necessary to burden the plaintiff's rights. . . .  [W]hen a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions. . . . Accordingly, we have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the  polls.[21]

In Timmons v. Twin Cities Area New Party,[22] the Court upheld a state ban on multiple-party or "fusion" candidacies.  Recognizing that "States may, and inevitably must, enact reasonable regulation of parties, elections, and ballots to

---

[21] Id. at 432-434, 438 (internal quotation marks omitted).

[22] 520 U.S. 351 (1997).

reduce election- and campaign-related disorder," [23] the Court again employed a flexible, balancing approach to the issue presented:

> When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions. [24]

In ACLF, we addressed a constitutional challenge to several procedures of the then-existing law of Colorado governing ballot initiatives. While, as discussed below, we struck down several provisions under a strict scrutiny analysis, we upheld other provisions under a balancing test. We upheld a six-month window for obtaining the necessary signatures on a petition. [25] We concluded that this requirement was not subject to strict scrutiny, and upheld it as "a reasonable, nondiscriminatory ballot access regulation. [26] We similarly upheld a requirement that circulators sign an affidavit attesting that they have complied

_____

[23] Id. at 358.

[24] Id. at 358 (citations, internal quotation marks omitted).

[25] See Colo. Rev. Stat. § 1-40-108(1) (1999).

[26] See ACLF, 120 F.3d at 1099.

with Colorado law. [27] We also upheld a requirement that circulators be at least eighteen years of age, reasoning that the requirement imposed only a temporary disability that was not subject to exacting scrutiny. [28]

B.     Strict Scrutiny

In Meyer v. Grant,[29] the Court struck down a criminal provision of the Colorado initiative law that prohibited proponents from paying petition circulators. The Court held that the case involved "core political speech" and "a limitation on political expression subject to exacting scrutiny."[30] The Court reasoned that the law reduced "the total quantum of speech on a public issue."[31] The decision turned on the strict scrutiny the Court employed. Once it adopted this standard, it struck down the provision because "the burden that Colorado must overcome to justify this criminal law is well-nigh insurmountable."[32]

In ACLF, we struck down a Colorado requirement that all circulators must be registered voters. We applied strict scrutiny to this requirement, because its

---

[27] See id. at 1099-1100 (discussing Colo. Rev. Stat. § 1-40-111(2) (1999)).

[28] See id. at 1101 (discussing Colo. Rev. Stat. § 112(1) (1999)).

[29] 486 U.S. 414 (1988).

[30] Id. at 420, 422.

[31] Id. at 423.

[32] Id. at 425.

effect was discriminatory, in that it excluded persons who were not registered voters from participating in core political speech, and because it limited the total quantity of speech, by limiting "the number of voices to convey the proponent's message." [33] We held, under a strict scrutiny analysis, that the state had failed to advance a compelling state interest to which the requirement was narrowly tailored. [34] We also struck down a requirement that circulators wear identification badges giving their names. We applied strict scrutiny to this requirement, noting the district court's finding that the requirement discourages people from serving as circulators, and concluding that a requirement that stripped the circulator of his anonymity imposed a "severe" restriction on First and Fourteenth Amendment rights. [35] We also struck down requirements that the proponent file certain disclosures relating to the identities of paid circulators and amounts paid to each such circulator. Finding such restrictions analogous to the requirement of identification badges, and citing Buckley v. Valeo,[36] we held that these restrictions were subject to exacting scrutiny. [37] We noted that, like the

---

[33] ACLF, 120 F.3d at 1100.

[34] See id.

[35] See id. at 1101-02.

[36] 424 U.S. 1, 64 (1976).

[37] See ACLF, 120 F.3d at 1104.

requirement of identification badges, the disclosure requirements chilled

constitutionally protected speech. [38]

In ACLF, the state obtained review in the Supreme Court. The Court

affirmed our judgment. [39] The Court concluded "that the Tenth Circuit correctly

separated necessary or proper ballot access controls from restrictions that

unjustifiably inhibit the circulation of ballot-initiative petitions." [40]

C.      The Pending Challenge

"No bright line separates permissible election-related regulation from

unconstitutional infringements on First Amendment freedoms." [41] In the pending

case, we are persuaded that the balancing test is appropriate. As we read the

decisions described above, the balancing test is a general approach our court and

the Supreme Court have employed in deciding the constitutionality of content-

neutral regulation of the voting process. A balancing test takes account of the

---

[38] See ACLF, 120 F.3d at 1105 (noting that provision requiring the disclosure of information specific to each paid circulator chilled speech because "[m]uch like requiring identification badges, compelling the disclosure of the identities of every paid circulator chills paid circulation, a constitutionally protected exercise," and that a second provision requiring detailed monthly disclosures "chills speech by forcing paid circulators to surrender the anonymity enjoyed by their volunteer counterparts.").

[39] ACLF, 119 S. Ct. at 649 (1999).

[40] Id.

[41] Timmons, 520 U.S. at 359 (1997).

Supreme Court's recognition that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." [42]

Strict or exacting scrutiny has been employed in circumstances not presented in the pending case. The cases discussed above which applied strict scrutiny do not lend themselves to a simple synthesis. As we read them, however, strict scrutiny is applied where the government restricts the overall quantum of speech available to the election or voting process. More particularly, strict scrutiny is employed where the quantum of speech is limited due to restrictions on campaign expenditures, as in Valeo, the available pool of circulators or other supporters of a candidate or initiative, as in ACLF and Meyer, or the anonymity of such supporters, as in ACLF, Valeo, and McIntyre v. Ohio Elections Comm'n.[43] For example, the Court explained in Meyer "that the prohibition against the use of paid circulators has the inevitable effect of reducing the total quantum of speech on a public issue." [44] In Valeo, the Court applied exacting scrutiny to contribution and expenditure limits, [45] reasoning that "contribution and

---

[42] Storer v. Brown, 415 U.S. 724, 730 (1974).

[43] 514 U.S. 334, 347 (1995).

[44] Meyer, 486 U.S. at 423.

[45] See Valeo, 424 U.S. at 25, 44-45.

-14-

expenditure limitations impose direct quantity restrictions on political communication and association by persons, groups, candidates, and political parties," and that "a primary effect of . . . expenditure limitations is to restrict the quantity of campaign speech by individuals, groups, and candidates." [46] In our view, the title setting process appellants challenge cannot be characterized as a direct limitation on the quantity of speech available to them. If anything, requiring proponents to pursue separate initiatives on separate subjects might encourage more speech on each such subject.

Having selected the balancing test, we have little trouble agreeing with the district court that the single subject and other title setting requirements are constitutional. Colorado has advanced in this litigation and by statute (quoted above) valid justifications for these requirements. The summary, single subject and title requirements serve to prevent voter confusion and promote informed decisions by narrowing the initiative to a single matter and providing information on that single matter to the voter. Further, they prevent a provision that would not otherwise pass from becoming law by "piggybacking" it on a more popular proposal or concealing it in a long and complex initiative. As with minor and third parties at issue in Timmons, the state has a valid interest in making sure that initiatives "granted access to the ballot are bona fide and actually supported, on

---

[46] Id. at 18, 39.

their own merits, by those who have provided the statutorily required petition or ballot support." [47]  These justifications are sufficient to pass constitutional muster. "[T]he State's asserted regulatory interest need only be sufficiently weighty to justify the limitation imposed on the [plaintiff's] rights.  Nor do we require elaborate, empirical verification of the weightiness of the State's asserted justifications." [48]  "[T]he state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." [49]  Colorado's title setting requirements are facially neutral and the state has offered reasonable justification for them.

We also note that in ACLF the Supreme Court stated that "in aid of efficiency, veracity, or clarity, Colorado has provided for an array of process measures not contested here by [plaintiff].  These measures prescribe, inter alia, a single subject per initiative limitation . . . ." [50]  While not ruling on the constitutionality of the single subject provision, the Court did note its apparent virtue, and explained that "[o]ur judgment is informed by other means Colorado

---

[47] Timmons, 520 U.S. at 366.

[48] Id. at 364 (citations, internal quotation marks omitted).

[49] Anderson, 460 U.S. at 788.

[50] ACLF, 119 S. Ct. at 649.

employs to accomplish its regulatory purposes." [51] The Court also cited, with apparent approval, Biddulph v. Mortham,[52] as a case "upholding single subject and unambiguous title requirements for initiative proposals to amend Florida's Constitution." [53]

While appellants offered evidence below of difficulties they have encountered in complying with the single subject requirement, [54] they did not prove that the state applied the single subject requirement in a manner that discriminated against proponents on the basis of the content of their initiatives. [55]

---

[51] Id. at 642.

[52] 89 F.3d 1491 (11th Cir. 1996).

[53] ACLF, 119 S. Ct. at 642.

[54] We note that the district court was not particularly sympathetic to these difficulties. For example, the court agreed with the state "that the frustration Plaintiffs Bruce and Wright have experienced at their inability to see Initiative #30 through the title-setting process is less a function of a system gone awry than of their refusal, which Plaintiff Bruce candidly acknowledged at trial, to change the proposal's language in any significant way during the course of 12 submissions." Campbell, 11 F. Supp.2d at 1267.

[55] Appellants point to language in the district court's opinion that certain Colorado Supreme Court cases "provide a substantial basis for Plaintiffs' trepidation" that these cases "target initiatives based on the unpopularity of their proponents and their message." Id. at 1267-68. However, the district court ultimately found that a "discernible pattern or practice of illicit discrimination" had not been shown, and that "[t]he single-subject scheme is content-neutral and Plaintiffs' claims that it is being discriminatorily applied to them are unsupported by the evidence." Id. at 1267, 1269. On this record we cannot say that the district court's finding is erroneous.

While compliance with the single subject requirement may be difficult for some who wish to offer ballot initiatives, and may to some extent limit their goal of unfettered participation in the electoral and legislative process, we are satisfied that the state's reasons for its procedures are sufficiently weighty to justify the procedures.

D.     Equal Protection

Appellants separately argue that the title setting requirements amount to an equal protection violation. They contend that even though both the general assembly and proponents of citizen initiatives are subject to title setting requirements, the general assembly, through its own conduct and as sanctioned by the Colorado Supreme Court, has much more leeway than citizens on these requirements. For example, they contend that legislatively referred measures cannot be challenged for single subject compliance until after voter approval, [56] and that legislative bills similarly cannot be challenged until after they are passed into law. In contrast, citizen initiatives are subjected to single subject approval before the petition can be circulated. They further argue that, by statute, the title

_____

[56] See Polhill v. Buckley, 923 P.2d 119, 120 (Colo. 1996) (holding that Colorado Supreme Court lacks jurisdiction to review legislative referendum for compliance with single-subject requirement until approved by voters.)

-18-

setting process for citizen initiatives is supposed to be conducted in the same manner as the title setting process for general assembly bills. [57]

In our view, the alleged differences in the treatment of citizen initiatives and acts of the general assembly simply do not lend themselves to an equal protection analysis. "The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike."[58] "The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike. But so too, the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same. The initial discretion to determine what is 'different' and what is 'the same' resides in the

---

[57] As discussed above, the single subject requirement for citizen initiatives is found at Colo. Const. Art. V, § 1(5.5). General assembly bills as well as constitutional amendments proposed by the general assembly and submitted to the electorate are also subject to a single subject requirement. See Colo. Const. art. V, § 21 & art. XIX, § 2(3). The general assembly has expressed its intent that "section 1(5.5) of article V and section 2(3) of article XIX be liberally construed, so as to avert the practices against which they are aimed and, at the same time, to preserve and protect the right of initiative and referendum." Colo. Stat. Ann. § 1-40-106.5(2) (1999). It has also expressed its intent "that, in setting titles pursuant to section 1(5.5) of article V, the initiative title setting review board created in section 1-40-106 should apply judicial decisions construing the constitutional single-subject requirement for bills and should follow the same rules employed by the general assembly in considering titles for bills." Id § 1-40-106.5(3).

[58] City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985).

legislatures of the States."[59]  "In order to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them."[60]  Ordinarily the Equal Protection Clause is applied to claims of class-based discrimination.[61]

Citizens who propose legislation through the initiative process and members of the general assembly who pass bills are not similarly situated classes. Members of the general assembly must win an election to even serve in that body, and, unlike initiatives, general assembly bills are subject to veto by the governor. Before a vote on a bill, it is subject to committee consideration, amendment, and debate according to the rules of the general assembly.  The legislative process and the initiative process are so fundamentally different that we cannot read the Equal Protection Clause of the federal Constitution to require the state to afford the same title setting treatment to these two processes.

AFFIRMED.

---

[59] Plyler v. Doe, 457 U.S. 202, 216 (1982) (citation, brackets, internal quotation marks omitted).

[60] Barney v. Pulsipher, 143 F.3d 1299, 1312 (10th Cir. 1998).

[61] See, e.g., Plyler, 457 U.S. at 213 (1982) ("The Equal Protection Clause was intended to work nothing less than the abolition of all caste-based and invidious class-based legislation.");  United States v. Batchelder, 442 U.S. 114, 125 n.9 (1979) ("The Equal Protection Clause prohibits selective enforcement based upon an unjustifiable standard such as race, religion, or other arbitrary classification.") (internal quotation marks omitted).