In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3801

Clinton A. Krislov, individually and on behalf
of all others similarly situated, and Joan A.
Sullivan,

Plaintiffs-Appellees,

v.

Wanda L. Rednour, Chairman of the State Board
of Elections, Hannelore Hulsman, Vice Chairman
of the State Board of Elections, Ronald D.
Michaelson, Executive Director of the State
Board of Elections, et al.,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 674--Elaine E. Bucklo, Judge.

Argued April 20, 2000--Decided September 5, 2000

Before Manion, Rovner, and Williams, Circuit Judges.

Manion, Circuit Judge.  Clinton Krislov and Joan
Sullivan were candidates in the March 1996
Illinois Democratic Party primary elections for
the United States Senate and the seventh
congressional district for the United States
House of Representatives, respectively. They
initially obtained the required number of
signatures to be placed on the ballot. Supporters
of other candidates, however, objected to some of
the signatures because they were gathered by
circulators who were not registered voters in
Illinois or the seventh district, as required by
Illinois law. After expending substantial time,
effort and money, Krislov and Sullivan managed to
salvage enough signatures to remain on the
ballot, although Krislov voluntarily decided to
exit the Senate race before the primary. Krislov
and Sullivan sued the Illinois Board of
Elections, claiming that requiring signature
gatherers to be registered voters of the relevant
political subdivision violates the First and
Fourteenth Amendments of the United States
Constitution. After the Supreme Court issued its
decision in Buckley v. American Constitutional

Law Foundation, Incorporated, 525 U.S. 182 (1999), which declared a similar ballot-access law unconstitutional, the district court granted summary judgment for the candidates. The Board appeals, arguing that the plaintiffs do not have standing, that Buckley does not control this case, and that the law in question is narrowly tailored to serve a compelling interest. We affirm.

I.

Clinton Krislov is an Illinois attorney who sought the nomination of the Democratic Party for one of the United States Senate seats in the March 1996, Illinois primary election. Joan Sullivan is a retired systems analyst who was one of ten candidates seeking the Democratic nomination for the United States House of Representatives seat for the seventh congressional district in the same 1996 primary election. Wanda Rednour and the rest of the defendants-appellants are members of the Illinois State Board of Elections, which supervises the administration of Illinois election laws. 10 ILCS 5/1A-1. Krislov and Sullivan ("the candidates") brought this suit against the Board members in their official capacities to enjoin enforcement of the Illinois nomination petitions statute. 10 ILCS 5/7-10. In particular, they complain about two restrictions on their use of nominating petition circulators: (1) that the circulator must be a registered voter; and (2) that the circulator must be registered to vote in the same political subdivision for which the candidate is seeking office, which for Krislov would be the entire State of Illinois, while for Sullivan it is the seventh congressional district. 10 ILCS 5/7-10./1

Under the statute, the candidate must obtain the required number of signatures: at least 5,000 but not more than 10,000 for the Senate race, and for the congressional race, .5% of the qualified primary electors of the candidate's party in the congressional district. 10 ILCS 5/7-10(a), (b). Both Krislov and Sullivan acknowledge that they were able to do this with their own resources. But they point out that they did not always get to use the circulators of their choice. That is, they had supporters who were not registered to vote in Illinois, but who were willing to gather signatures for them and speak on their behalf while soliciting signatures. They couldn't utilize these people, however, because any signatures gathered by non-resident, non-registered solicitors would have been invalidated under 5/7-10.

Candidates who are successful in garnering the

required number of signatures must then file them with the State, which both candidates did. At this point, the party organization can scrutinize the signatures and possibly challenge them. According to the plaintiffs, the established political parties have extensive resources for carrying out these challenges, while the unendorsed candidates frequently cannot marshal the same efforts, thus ending their candidacies. When signatures are challenged, a candidate can opt to employ limited campaign resources to defend the validity of the signatures (rather than spend the time and money on the campaigns), or he can ignore the challenge and face the real possibility of not appearing on the ballot. According to the plaintiffs, this is exactly the scenario they faced in the present case./2

In Krislov's case, many of the 10,000 signatures he filed were challenged by allies of his Party-supported primary opponent (and eventual winner). Sullivan's signatures faced similar challenges. Among the complaints lodged against the signatures was the charge that circulators of some petitions were not registered voters in the relevant political districts. The candidates were forced to devote significant amounts of time, money, personnel, and energy responding to the challenges during the two months preceding the primary election. This prevented the candidates from devoting these resources to getting their message out to the public.

In response to these challenges, as the March primary approached, Krislov initiated this suit as a class action under 42 U.S.C. sec. 1983, alleging a violation of his First and Fourteenth Amendment rights. Specifically, he alleged that because section 7-10 prevented him from using large numbers of non-registered residents to circulate his petitions, the law violated his right to freely associate with those potential circulators for the purpose of political expression. He claimed the law also violated his right to ballot access. Krislov bowed out of the race in February 1996, but continued to maintain this suit and sought class certification, in part because he expects to run for election in the future. Sullivan joined the suit in April 1996. The district court subsequently certified a class which includes all candidates whose nominations to a primary election ballot have been or will be challenged on the basis of 5/7-10. Krislov v. Rednour, 946 F. Supp. 563, 569 (N.D. Ill. 1996). Both the candidates and the Board moved for summary judgment, which the district court initially granted for the Board. Krislov v. Rednour, 980 F. Supp. 267 (N.D. Ill. 1997). Later, it vacated that decision and granted summary judgment for the candidates in light of

the Supreme Court's decision in Buckley v. American Constitutional Law Foundation, Incorporated, 525 U.S. 182 (1999) (invalidating Colorado's requirement that petition circulators for ballot initiatives be registered voters of the State). Krislov v. Rednour, No. 96-C-674, 1999 WL 1794035 (N.D. Ill. July 7, 1999). The district court enjoined the Board from enforcing the offending portions of 5/7-10 and entered a final judgment pursuant to Federal Rule 54(b). The Board appeals.

II.
A.  Standing and Mootness

   The Board first challenges the summary judgment on standing and mootness grounds. In particular, it alleges that, because the candidates acquired enough signatures to appear on the respective ballots, they suffered no injury.

   Article III of the Constitution provides that the judicial power of the courts extends only to cases or controversies. Therefore, parties seeking to invoke the jurisdiction of federal courts must show that they have standing to sue within the meaning of Article III. Standing has essentially three components. A plaintiff must show that he has suffered an "injury in fact," that the challenged action caused the injury, and that the injury can likely be redressed by the cause of action. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); State of Wis. v. F.E.R.C., 192 F.3d 642, 646 (7th Cir. 1999).

   Here, while the candidates were able to obtain enough signatures to appear on the ballot, they were injured in several different ways. By being denied use of non-registered, non-resident solicitors, they were required to allocate additional campaign resources to gather signatures and were deprived of the solicitors (political advocates) of their choice. This in itself can be an injury to First Amendment rights. Meyer v. Grant, 486 U.S. 414, 424 (1988). Second, because they were prohibited from using non-registered and non-resident circulators, they were limited in the choice and number of people to carry their message to the public. See Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley, 454 U.S. 290, 294 (1981) ("by collective effort individuals can make their views known, when, individually, their voices would be faint or lost"). This injured the plaintiffs by limiting the size of the audience the candidates could reach and reducing the quantum of speech about the candidates' political views that otherwise could be generated. Meyer, 486 U.S. at 421-22. Also, as we discuss in more detail below, the candidates claim to have been

deprived of their right to expressively associate with non-registered or non-resident citizens who were willing to circulate petitions on their behalf. See California Democratic Party v. Jones, 120 S. Ct. 2402, 2408 (2000); Tashjian v. Republican Party of Conn., 479 U.S. 208, 215 (1986) (the First Amendment protects the right of party members to associate and organize with nonmembers to achieve political goals); Kusper v. Pontikes, 414 U.S. 51, 56-57 (1973) ("unduly restrictive state election laws may so impinge upon freedom of association as to run afoul of the First and Fourteenth Amendments"). Thus, the fact that the candidates garnered enough signatures to be placed on the ballot does not negate the other injuries they may have suffered. These alleged injuries are directly traceable to 5/7-10, thereby satisfying the causation element of standing.

As to redressability, the candidates must only show that the requested relief will likely cure the alleged injury. Gillespie v. City of Indianapolis, 185 F.3d 693, 701 (7th Cir. 1999). Put differently, the plaintiffs must show that they would benefit in a tangible way from the district court's intervention. See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 162 (4th Cir. 2000) (citing Warth v. Seldin, 422 U.S. 490, 508 (1975)). Because the district court has the ability to enjoin the enforcement of the statute, the harm is sufficiently redressable in this suit. See Friends of the Earth, Inc., 204 F.3d at 162.

As to mootness, everyone concedes the obvious, that the date of the primary election in which Krislov and Sullivan wished to participate has long since passed. Nevertheless, because the use of non-resident, non-registered solicitors is still prohibited by Illinois with respect to future elections, this case is capable of repetition yet evading review, a recognized exception to the mootness doctrine. Rosario v. Rockefeller, 410 U.S. 752, 756 n.5 (1973) (case was not moot although date of primary had passed and plaintiffs were eligible to participate in the election where their case was capable of repetition but likely to evade review); Patriot Party of Allegheny County v. Allegheny City of Dept. of Elections, 95 F.3d 253, 257 (3d Cir. 1996). This exception to the mootness doctrine is applicable, as in the present case, where the challenged situation is likely to recur and the same complaining party would be subjected to the same adversity. In re Associated Press, 162 F.3d 503, 511 (7th Cir. 1998); Orion Sales, Inc. v. Emerson Radio Corp., 148 F.3d 840, 842 (7th Cir. 1998). Because at least Krislov has articulated an interest in pursuing the Democratic Party's

nomination for other elective offices, we have no doubt that this case meets these requirements. Hence, the candidates have standing to bring this action and mootness is not a bar to the suit.

## B. First Amendment

The First Amendment, made applicable to the States by the Fourteenth Amendment, prohibits States from enforcing laws "abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. This Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484 (1957). Associating for the purpose of placing a candidate on the ballot is one of the actions protected by the First Amendment; indeed the circulation of petitions for ballot access "involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" Meyer, 486 U.S. at 421-22; see Timmons v. Twin Cities Area New Party, 520 U.S. 351, 357 (1997); Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979). Restrictions on ballot access, therefore, can violate several constitutionally protected interests. See, e.g., Illinois State Bd. of Elections, 440 U.S. at 184 (restrictions on ballot access implicate the right to associate for political purposes, the right to vote, and the right to express political preferences); Williams v. Rhodes, 393 U.S. 23, 30 (1968).

Like most rights, however, the candidates' First Amendment rights are not absolute. Burdick v. Takushi, 504 U.S. 428, 433 (1992); Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986). The Constitution does not prohibit the States from enacting laws which incidentally burden candidates, for such a proscription would similarly preclude the regulation of elections and efforts to ensure their integrity. Because elections must be regulated to remain free from fraud and coercion, some latitude is given to regulations designed to serve these purposes. See California Democratic Party, 120 S. Ct. at 2406-07; Toledo Area AFL-CIO Council v. Pizza, 154 F.3d 307, 325 (6th Cir. 1998). The Constitution itself grants the States broad powers to regulate the time, place, and manner of elections, including primary elections. U.S. Const. art. I, sec. 4, cl. 1; see Oregon v. Mitchell, 400 U.S. 112, 118 (1970) (age minimum); Pope v. Williams, 193 U.S. 621, 632, 633 (1904) (residency restriction); Campbell v. Buckley, 203 F.3d 738, 743 (10th Cir. 2000). In assessing whether a

State election law impermissibly burdens First Amendment rights, we examine the character and magnitude of the burden and the extent to which the law serves the State's interests. Burdick, 504 U.S. at 434; Anderson v. Celebrezze, 460 U.S. 780, 789 (1983). Laws imposing severe burdens must be narrowly tailored to serve compelling state interests, but lesser burdens receive less exacting scrutiny. California Democratic Party, 120 S. Ct. at 2412; Timmons, 520 U.S. at 358.

1. The nature and extent of the burden.

The district court determined that 5/7-10 placed a substantial burden on the candidates' rights./3 The Board concedes that the regulation imposes some burden, but argues that it is minimal. In cases where the material facts are undisputed, the character and extent of the statute's burden involves a question of law which we review de novo. (WIN) Washington Initiative Now v. Rippie, 213 F.3d 1132, 1137 (9th Cir. 2000); Weir v. Nix, 114 F.3d 817, 820 (8th Cir. 1997).

In arguing that the regulation is only minimally burdensome, the Board mistakenly focuses solely on the fact that Krislov needed only 5,000 signatures statewide to be placed on the ballot, while Sullivan needed only about 660 from the district./4 In reality a candidate needs a surplus of signatures, because they will likely be challenged on any number of grounds, resulting in some, perhaps many, invalidations. See Molinari, 82 F. Supp.2d at 75 (Party chairman conceded campaign needed to obtain up to six times the required number of signatures to ensure that enough signatures survive technical challenges). And the number of signatures a candidate is required to obtain is just one of several important considerations. See Buckley, 525 U.S. at 193 n.15; Storer v. Brown, 415 U.S. 724, 740 (1974). Even though the candidates in this case ultimately obtained ballot access, in the process their rights were substantially burdened. The uncontested record indicates that their ballot access took a lot of time, money and people, which cannot be characterized as minimally burdensome. In addition, the candidates contend that the statute installs other barriers: it inhibits their right to ballot access; it burdens their right to associate with a class of circulators; it limits their ability to choose the methods of political speech they consider most effective for their campaigns; and it reduces their ability to disseminate their message to a wider audience. Thus, even an election law which required a candidate to obtain only a relatively small number of signatures

could still burden First Amendment rights if it also precluded the candidate from utilizing a large class of potential solicitors to convey his message, or if it substantially restricted the candidate's ability to choose the means of conveying his message. Meyer, 486 U.S. at 421-22. So the number of signatures the candidates were required to gather is not the only relevant consideration.

What is particularly important in this case, and what was correctly the focus of the district court's attention, is the number of people the registration and residency requirements exclude from gathering signatures and thus disseminating the candidates' political message. See Buckley, 525 U.S. at 193 n.15 (considering the number of potential circulators who were disqualified from soliciting signatures). The Board concedes that, when counting only Illinois residents who are adults, the number of those not registered or those not living in the seventh congressional district is in the millions, and that does not include potential out-of-state solicitors. By substantially reducing the number of potential solicitors, the Illinois "requirement reduces the voices available to convey political messages." Buckley, id. at 210 (Thomas, J., concurring); see Buckley v. Valeo, 424 U.S. 1, 50 (1975) ("legislative restrictions on advocacy of the election or defeat of political candidates are wholly at odds with the guarantees of the First Amendment"). By preventing the candidates from employing millions of potential advocates to carry their political message to the people of Illinois, the statute places a formidable burden on the candidates' right to disseminate their message. Buckley, 525 U.S. at 193 n.15 (impermissible burden placed on speech where state law barred less than one million potential circulators).

The candidates' right to promote their political views is also intimately connected with their right of political association, fittingly called the right of expressive association. Citizens Against Rent Control, 454 U.S. at 300; see generally, Boy Scouts of Am. v. Dale, 120 S. Ct. 2446 (2000). This right is "especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984); Marshall v. Allen, 984 F.2d 787, 800 (7th Cir. 1993) (freedom of association protects individual's interest in associating with others to advance political views). "Political association is at the core of the First Amendment, and even practices that only potentially threaten political association are

highly suspect." McCloud v. Testa, 97 F.3d 1536, 1552 (6th Cir. 1996). Although the Illinois provision does not go so far as to specifically prohibit candidates from associating with individuals who are not residents of Illinois or who are not registered to vote, it still substantially burdens this right of association by preventing the candidates from using signatures gathered by these circulators in an attempt to reserve a place on the ballot. By doing so, the law inhibits the expressive utility of associating with these individuals because these potential circulators cannot invite voters to sign the candidates' petitions in an effort to gain ballot access./5 This, in turn, prevents these individuals from being used as conduits for disseminating the candidates' brand of political speech.

The burden placed on the candidates' First Amendment rights is similar in character and magnitude to burdens which the Supreme Court has found to be weighty. For instance, in Meyer v. Grant the Court stated that the prohibition against paying circulators of initiative petitions burdened the free flow of ideas by limiting the number of voices who will convey the desired message, by reducing the size of the audience who might hear the message, and by making it less likely that the requisite number of signatures will be obtained, which in itself inhibited further discussion of the relevant issues. Id. at 422-23. And recently, in Buckley v. American Constitutional Law Foundation, Incorporated, the Court held that a Colorado law placed a formidable burden on First Amendment rights because it permitted only registered voters of Colorado to circulate initiative petitions for ballot access. 119 S. Ct. at 643. Accordingly, while an analysis of the burden a law places on First Amendment rights is situation-specific, the similarity between these cases and the present one strongly suggests that the Illinois statute severely burdens the candidates' rights.

In an attempt to refute this conclusion, the Board makes two arguments. First, it argues that Buckley and Meyer are distinguishable, as they involved ballot access petitions for initiatives and not candidates. This is not a particularly relevant distinction, however. To the extent it is relevant, it suggests that the burden on the candidates is even greater than that placed on those who circulate petitions for ballot initiatives. For the ballot initiative proponent will generally seek support for the one narrow issue presented in the initiative, while the typical candidate embodies a broad range of political opinions, and thus those who solicit

signatures on their behalf must speak to a broader range of political topics. See Colorado Republican Fed. Campaign Comm. v. FEC, 518 U.S. 604, 629 (1996) (Kennedy, J., concurring and dissenting) (people often give effect to their views by selecting and supporting candidates who reflect those views); Lubin v. Panish, 415 U.S. 709, 716 (1974) (voters assert their preferences through candidates). Indeed, the Supreme Court has recognized that the primary election process often has the effect of determining a political party's position on a variety of significant issues. California Democratic Party, 120 S. Ct. at 2408. Thus, it is appropriate to say that "democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." Id. By precluding a class of people from soliciting signatures on behalf of a particular candidate, the Illinois law has the potential to squelch a greater quantity and broader range of political speech than laws which only restrict initiative proponents. So this distinction provides no support for the Board's position, and certainly doesn't convince us that the Illinois law doesn't burden the candidates' rights.

Illinois next argues that any burden on the candidates is exaggerated, because although the law might prevent millions of people from soliciting signatures on the candidates' behalf, it is unrealistic to presume that even a few of those individuals restricted by the law were actually interested in circulating petitions for these candidates. It is undoubtedly true that most people excluded from soliciting signatures would likely not be avid supporters. But this fact actually underscores the candidates' argument that the law severely burdens them. Candidates who do not have broad support must count on only a few supporters, and if they are not registered to vote or do not live in the district, the already small pool of volunteers will evaporate, thus greatly limiting the candidates' ability to disseminate their message and obtain the required signatures. By contrast, candidates with the full support of established parties might easily afford to have non-voting citizens excluded from the much larger pool of potential petition circulators. According to the Board's argument, the law is not particularly restrictive because it might only prevent the candidates from using one or two solicitors. But for some minor candidates, parting with one or two avid circulators could significantly impact their campaigns.

Furthermore, a candidate is entitled, for the most part, to have the spokesperson of his

choice. "Government may regulate the manner of speech in a content-neutral way but may not infringe on an individual's right to select the means of speech." Foti v. City of Menlo Park, 146 F.3d 629, 641-42 (9th Cir. 1998). "The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." Meyer, 486 U.S. at 424. Therefore, contrary to the Board's argument, the fact that the regulation leaves open other possibilities of expression (circulators who are registered residents) does not mean that the law is not burdensome. Id.; see Hill v. Colorado, 120 S. Ct. 2480, 2524 (2000) (Kennedy, J., dissenting) ("Our foundational First Amendment cases are based on the recognition that citizens, subject to rare exceptions, must be able to discuss issues, great or small, through the means of expression they deem best suited to their purpose. It is for the speaker, not the government, to choose the best means of expressing a message."). To the extent the Illinois law prevents candidates from using the people they consider to be the best means of carrying their message to the public, it places a substantial burden on the candidates' ability to convey their political ideas, even if it only restricts the candidate from using a few circulators. Along these lines, Krislov asserted in an affidavit that he had friends who were willing and able to help, but who were effectively excluded from helping because of the Illinois statute. This necessarily burdened his speech and associational interests, and we think that this burden is substantial.

Section 7-10 places a substantial burden on the candidates' First Amendment rights by making it more difficult for the candidates to disseminate their political views, to choose the most effective means of conveying their message, to associate in a meaningful way with the prospective solicitors for the purposes of eliciting political change, to gain access to the ballot, and to utilize the endorsement of their candidacies which can be implicit in a solicitor's efforts to gather signatures on the candidates' behalf. Accordingly, to survive, the statute must withstand exacting scrutiny./6


   2.  Compelling interests and narrow tailoring.

   Laws which place a substantial burden on First Amendment rights may still withstand heightened scrutiny if they are narrowly tailored to serve a compelling state interest. Eu v. San Francisco County Democratic Central Comm., 489 U.S. 214, 225 (1989); Libertarian Party of Ill. v. Rednour,

108 F.3d 768, 773 (7th Cir. 1997). The question of whether the Board's asserted interests qualify as compelling is one of law; where the material facts are undisputed, the necessity of the chosen means also involves a question of law. We review both of these questions de novo. (WIN) Washington Initiative Now, 213 F.3d at1137; Citizens Concerned About Our Children v. School Bd. of Broward County, Fla., 193 F.3d 1285, 1292 (11th Cir. 1999) (per curiam); Peterson v. Minidoka County Sch. Dist. No. 331, 118 F.3d 1351, 1357, amended, 132 F.3d 1259 (9th Cir. 1997). We assess whether the state's interest is substantial by examining the specific facts of the case. California Democratic Party, 120 S. Ct. at 2413. In evaluating the breadth of the law, we must take into account the other mechanisms the State currently employs to serve the statute's purpose, as well as other, less restrictive means it could reasonably employ. Norman v. Reed, 502 U.S. 279, 293 (1992); Jenness v. Fortson, 403 U.S. 431, 442 (1971); Ayres v. City of Chicago, 125 F.3d 1010, 1016 (7th Cir. 1997). The State need not use the least restrictive means available, as long as its present method does not burden more speech than is necessary to serve its compelling interests. Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989); Anderson, 460 U.S. at 789; Ayres, 125 F.3d at 1016.

   The Board asserts that three interests are served by 5/7-10. First, the law ensures that the candidates have a significant level of support in the community to merit ballot access so as to avoid confusion and deception. The Supreme Court has held that this is an important interest. Jenness, 403 U.S. at 442; see Libertarian Party of Ill., 108 F.3d at 775 (Illinois has an important interest in ensuring that a new political party has a modicum of support before placing its candidates on the ballot); Prestia v. O'Connor, 178 F.3d 86, 88 (2d Cir. 1999) (per curiam). The problem here is that the law is not narrowly tailored to serve this interest. In fact, the law appears unnecessary, as the signature quota--5,000 in the case of Krislov and about 660 in the case of Sullivan--already ensures that candidates have a minimum level of support. See Lubin, 415 U.S. at 717 (signature requirement for ballot access is the most common means of testing a candidate's level of support). As long as the required number of signatures are valid and they were obtained by an adult, what more is needed? The Board does not suggest any way in which its interests are not sufficiently served by the signature quota. Thus the necessity of 5/7-10's residency and registration requirements is dubious.

   Furthermore, even if the Board's interest in

assuring a threshold level of support were not served by other means, it is obvious that the "fit" between the end to be served by the statute and the means selected to achieve it is not particularly tight, as the provision potentially excludes candidates who have support among the electorate, or who might have support if they could get out their message. Laws which could prevent viable candidates from being elected are at odds with the very foundation of our representative democracy. Bullock, 405 U.S. at 143 (invalidating on equal protection grounds a primary election filing fee where many "potential office seekers lacking both personal wealth and affluent backers are in every practical sense precluded from seeking the nomination of their chosen party, no matter how qualified they might be, and no matter how broad or enthusiastic their popular support"). Section 7-10 suffers from this very defect. Under this provision, a candidate who has reasonable support in his district might be denied the possibility of being placed on the ballot simply because his supporters who are registered voters and who reside in the relevant political subdivision may not have the time or the energy to solicit signatures. Such a candidate will be kept from disseminating his message and might be denied ballot access despite potential support from the electorate. This is the rationale the Court used in Lubin v. Panish when it invalidated a California law that required candidates for primary elections to pay a filing fee of $701.60. 415 U.S. at 710. The Court dismissed the State's asserted justification--the need to ensure that candidates have support among the electorate--because filing fees "do not, in and of themselves, test the genuineness of a candidacy or the extent of the voter support of an aspirant for public office." Id. at 717. Because the same is true of residency or registration requirements for petition circulators, section 7-10 also burdens much more speech than is necessary to serve its purpose. We therefore agree with the district court that this law is not narrowly tailored to serve the Board's goals. Ward, 491 U.S. at 799 (a statute cannot be narrowly tailored when it burdens "substantially more speech than is necessary to further the government's legitimate interests").

The Board next asserts that, by requiring solicitors to reside in the same district in which the candidate is seeking office, the law makes it more likely that they will be aware of the boundaries of the district and will thus solicit only valid signatures. This interest is largely paternalistic, as its underlying premise is that the State needs to protect candidates because they aren't savvy enough to find solicitors who can read a street map, and thereby

refrain from soliciting signatures in areas outside the relevant district. Of course, there is no per se bar to paternalistic laws, but they are highly suspect when they also burden speech. Eu, 489 U.S. at 223; Anderson, 460 U.S. at 798 (a law which restricts the flow of information primarily to serve paternalistic interests "must be viewed with some skepticism"); cf. 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 507 (1996) (state cannot prohibit commercial speech in an effort to serve paternalistic purpose where the chosen means has not been shown to serve the state's goal). Although the desire to help candidates obtain valid signatures, and thereby promote political speech, is a legitimate state interest, it's not clear that this interest should be considered compelling or important. Furthermore, we doubt this law is essential or even well suited to the asserted interest. The Board offers nothing to suggest that this law is necessary, even though the residency and registration requirements were added to the law about 1979, giving the Board an opportunity to compare petitions from before and after the amendment to determine whether the law has decreased the number of invalid signatures. The Board also doesn't attempt to show that residents of a given congressional district know the boundaries of that district to an appreciably greater extent than non-residents. But even assuming that this is true, a much more narrow law--like one that required candidates to provide all circulators with a map showing the boundaries of the district--would be more effective. And as to Krislov, State boundaries are easily discernible and equally apparent to all circulators, regardless of whether they reside in Illinois or another State, which makes the necessity of this provision even more questionable.

The Board also claims that this provision will at least help ensure the integrity of the election process, which as a general proposition is certainly a compelling interest. Timmons, 520 U.S. at 358. It argues that the residency requirement might increase the probability that only valid signatures will be collected, thus ensuring that candidates will not obtain ballot access unless they have valid signatures. But a resident would likely be at the same risk of obtaining an invalid signature (e.g., the signer's registration had expired) as would a non-resident. Like the Supreme Court, we think that the dangers to the electoral system envisioned by the Board are particularly remote when simply gathering signatures, and thus this interest might not be so important at this early stage in the election process as to justify the burden imposed. Meyer, 486 U.S. at 427 (risks of

deceit and fraud are more remote at the petition stage than at the time of balloting). Regardless, when "the Government defends a regulation on speech as a means to . . . prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured." Turner Broadcasting Sys., Inc. v. F.C.C., 512 U.S. 622, 664 (1994) (internal quotations omitted). It must show that the "recited harms are real, not merely conjectural" and that the regulation will in fact materially alleviate the anticipated harm. Id. The Board is unable to do this in light of the fact that the residency requirement is largely duplicative of its other requirements, and that circulators certify to the best of their knowledge that the signatures are valid. See 10 ILCS 5/10-4, 5/7-10. Furthermore, this interest is ultimately served by the Illinois process for challenging invalid signatures, which we discussed above. Importantly, the Board doesn't argue that its interest in obtaining valid signatures is greatly assisted by the residency restriction, or even that it is necessary to achieve this goal. Because the same ends can be achieved just as easily (and probably more effectively) through other means already in existence, the residency and registration requirements are unnecessary. And because those other means do not burden the candidate's speech and associational interests to the extent the residency and registration requirements do, the residency and registration requirements of section 7-10 cannot be described as narrowly tailored to serve these asserted interests.

The Board also contends that the law ensures that candidates have sufficient in-state support from the electorate. There seems to be three facets to this interest. First, the law ensures that candidates have a minimum of local support before they are placed on the ballot. We have already discussed this interest above, and regardless of how the argument is repackaged, the means chosen to serve this concern are not narrowly tailored. Second, the Board asserts an interest in allowing only Illinois voters to influence Illinois politics. If this means that the law is designed to ensure that only Illinois residents have a say in electing their representatives, nobody questions the legitimacy or weight of this interest. See Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 68-69 (1978) ("a government unit may legitimately restrict the right to participate in its political processes to those who reside in its borders"). But this interest in selecting and electing a candidate is already adequately served by several other provisions. Specifically, three other provisions state that only Illinois voters may sign

nominating petitions, vote in primary elections, and vote in the general election. See 10 ILCS 5/7-10 (nominating petitions); 10 ILCS 5/7-43 (primary elections); 10 ILCS 5/3-1 (general elections). Because only the signatures on the petition are counted, there is no apparent reason for the circulator to also be a registered voter residing in the district. This makes section 7-10 superfluous, and thus not narrowly tailored to serve this interest.

To the extent this law is designed to serve a third interest--preventing citizens of other States from having any influence on Illinois elections--we question its legitimacy. Such laws are harmful to the unity of our Nation because they penalize and discriminate against candidates who wish to associate with and utilize the speech of non-residents. Allowing citizens of the other forty-nine States to circulate petitions increases the opportunity for the free flow of political ideas. In some cases this might entail the introduction of ideas which are novel to a particular geographic area, or which are unpopular. But the First Amendment "was designed to secure the widest possible dissemination of information from diverse and antagonistic sources and to assure unfettered interchange of ideas for the bringing about of political and social change desired by the people." Buckley v. Valeo, 424 U.S. at 49 (internal punctuation omitted). This surely includes ideas from citizens of other States, and especially political ideas. Because circulating nominating petitions necessarily entails political speech, it follows that the First and Fourteenth Amendments compel States to allow their candidates to associate with non-residents for political purposes and to utilize non-residents to speak on their behalf in soliciting signatures for ballot access petitions. Cf. Warren v. Fairfax County, 196 F.3d 186, 190 (4th Cir. 1999) (en banc) (law which precludes non-residents from using public forum violates First Amendment); Vannatta v. Keisling, 151 F.3d 1215, 1218 (9th Cir. 1998) (law which prohibits candidates from accepting campaign contributions from anyone living outside the candidate's voting district violates the First Amendment); Whitmore v. FEC, 68 F.3d 1212, 1215 (9th Cir. 1995). Therefore, section 7/10 is not narrowly tailored to serve a compelling state interest. It therefore violates the First Amendment rights of the candidates and its enforcement must be enjoined./7
III.

Because 10 ILCS sec. 5/7-10 prevents political candidates from fully associating with individuals who are not registered to vote in the relevant political subdivisions to circulate

nominating petitions, and because it greatly minimizes the candidates' ability to disseminate one type of political speech through these individuals, the provision substantially burdens the candidates' First Amendment rights. It cannot withstand exacting scrutiny because although it helps ensure that candidates have a modicum of support among the electorate, it is not narrowly tailored to serve this or any other compelling interest. Therefore, the district court's decision to grant summary judgment for the candidates is
AFFIRMED.


/1 By requiring that circulators be registered voters living in the seventh district, section 7-10 creates an anomaly. Under the Qualifications Clause, not even candidates for the seventh district seat are required to live in the district. U.S. Const. art. I, sec. 2, cl.2 (requiring only that a Representative be twenty-five years-old, a citizen for seven years, and "an Inhabitant of that State in which he shall be chosen"). The Constitution also does not require candidates to be registered to vote, either generally or in a specific district. Recently, the Ninth Circuit invalidated a California law that required candidates for elected office to reside in that State at the time nominating petitions were filed, because States do not have the authority to supplement the constitutional requirements for the U.S. House of Representatives. Schaefer v. Townsend, 215 F.3d 1031 (9th Cir. 2000).

/2 This difficult process is not unique to Illinois. See Molinari v. Powers, 82 F. Supp.2d 57, 62-63 (E.D.N.Y. 2000) (describing challenges brought against the nominating petitions of Republican presidential candidate Steve Forbes by the New York Republican State Committee).

/3 Of course, the restriction also affects the rights of potential solicitors (unregistered non-residents) and those who might hear their message. See Sweezy v. State of N.H. by Wyman, 354 U.S. 234, 251 (1957) ("History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted."). But because none of these potential circulators has joined the candidates in seeking relief from the Illinois statute, like the district court we confine our analysis to the interests of the candidates.

/4 Neither the candidates nor the Board specifically offers the exact number of signatures Sullivan

needed to appear on the ballot, but they agree that it was about 660.

/5 As this court has previously noted, prohibiting candidates from using signatures gathered by forbidden circulators does not specifically preclude these circulators from speaking for the candidates. Citizens for John W. Moore Party v. Board of Election Comm'rs of the City of Chicago, 794 F.2d 1254, 1260 (7th Cir. 1986). But by making an invitation to sign the petition a thoroughly futile act, it does prevent some highly valuable speech from having any real effect. Robbed of the incentive of possibly obtaining a valid signature, candidates will be unlikely to utilize non-registered, non-resident circulators to convey their political message to the public.

/6 We note that even if the statute did not place a substantial burden on First Amendment rights we would still subject it to exacting scrutiny because it places more than a minimal burden on core political speech. See Meyer, 486 U.S. at 421-22 (circulating petitions for ballot access involves core political speech); see also McIntyre v. Ohio Elections Comm., 514 U.S. 334, 348 (1995) (laws that burden core political speech are subject to exacting scrutiny).

/7 This is not to say that a State could never regulate non-citizen circulators. Thus, for example, to ensure the integrity of the process, States might require non-citizens to register with the Board of Elections and agree to submit to the jurisdiction of Illinois courts. See Buckley, 119 S. Ct. at 644. And if the use of non-citizens were shown to correlate with a high incidence of fraud, a State might have a compelling interest in further regulating non-citizen circulators. But the Board does not assert these interests.