764 F.2d 538
 The LIBERTARIAN PARTY, a national political organization;
The Libertarian Party of Missouri; and Chad G.
Colopy, State Chairman of The
Libertarian Party of Missouri,
Appellants,
v.
Christopher BOND, in his official capacity as the Governor
of the State of Missouri; James Kirkpatrick, in his
official capacity as the Secretary of State of the State of
Missouri and Henry Koch, in his official capacity as the
Director of Elections for the State of Missouri, Appellees.
 No. 84-2355.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 12, 1985.
Decided June 17, 1985.
 
 Charles D. Sindel, Clayton, Mo., for appellants.
 Michael L. Boicourt, Jefferson City, Mo., for appellees.
 Before ROSS and JOHN R. GIBSON, Circuit Judges, and COLLINSON,* District Judge.
 ROSS, Circuit Judge.
 
 
 1
 The Libertarian Party challenges the constitutionality of Missouri statutes which govern the method by which new political parties are formed for the purpose of placing the party's name and the names of the party's candidates on the election ballot. MO.REV.STAT. Secs. 115.315, 317 (1978). In particular, the Libertarian Party challenges section 115.315(4). This section, which governs the formation of a new party for the entire State of Missouri, permits the formation of new parties if the party files a timely petition which is:
 
 
 2
 signed by the number of registered voters in each of the several congressional districts which is equal to at least one percent of the total number of votes cast in the district for governor in the last gubernatorial election, or by the number of registered voters in each of one-half of the several congressional districts which is equal to at least two percent of the total number of votes cast in the district for governor at the last gubernatorial election.
 
 
 3
 MO.REV.STAT. Sec. 115.315(4) (1978) (emphasis added). In sum, the statute imposes what may be termed a "one percent in each" or a "two percent in one-half" signature requirement.
 
 
 4
 In September of 1984, the Libertarian Party filed this action, requesting the district court to declare the Missouri statutes unconstitutional and to order election officials to place the party's name and the party's presidential and vice-presidential candidates on the November 1984 ballot.[1] The district court denied such relief on the basis that the statutes at issue were not unconstitutional. 596 F.Supp. 719. We agree with the district court. Accordingly, we affirm.
 
 FACTS
 
 5
 The Libertarian Party satisfied the Missouri ballot requirements for the 1980 election, but its candidates failed to gain enough votes in that election (more than two percent of all votes cast for any of the offices sought) to become an "established political party" for the State. MO.REV.STAT. Sec. 115.317 (1978). Hence, the Party had to satisfy the section 115.315(4) requirements again in order to get on the 1984 ballot.
 
 
 6
 It failed. The Party obtained signatures in only six of Missouri's nine congressional districts, so it did not satisfy the "one percent in each" test. Of those six districts, it met the two percent requirement in only three districts, so it did not satisfy the "two percent in one-half" test.[2] The following table sets forth the number of verified signatures obtained, and the number of signatures required under the two percent requirement, in each of the six districts in which the Libertarian Party obtained signatures:
 
 DISCUSSION
 1. Standard of Review
 
 7
 Ballot access restrictions place burdens on " 'the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.' " Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983) (quoting Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968)). These rights " 'rank among our most precious freedoms.' " Id.
 
 
 8
 Recognizing that vital individual rights are endangered by ballot access restrictions, the Supreme Court in Illinois Elections Board v. Socialist Workers Party, 440 U.S. 173, 184-85, 99 S.Ct. 983, 990-91, 59 L.Ed.2d 230 (1979) concluded that "a State must establish that its * * * [ballot access restrictions are] necessary to serve a compelling interest * * * [and] that * * * [it has] adopt[ed] the least drastic means to achieve * * * [its] ends." While the value of this "strict scrutiny" standard as a tool for decision-making is subject to question, id. at 188-89, 99 S.Ct. at 992-93 (Blackmun, J., concurring), and although this standard may not be applicable to all types of ballot access restrictions, see Clements v. Fashing, 457 U.S. 957, 962-66, 102 S.Ct. 2836, 2843-45, 73 L.Ed.2d 508 (1982) (plurality opinion), we shall apply this standard of review in this case. See McLain v. Meier, 637 F.2d 1159, 1163 (8th Cir.1980) (applying compelling state interest test to North Dakota ballot access statute which imposed signature requirement on new political parties).
 
 
 9
 Nevertheless, our application of this standard of review does not automatically lead to an easy answer. As the Court stated in Anderson:
 
 
 10
 Constitutional challenges to specific provisions of a State's election laws * * * cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. * * * Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. * * * The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made."
 
 
 11
 Anderson v. Celebrezze, supra, 103 S.Ct. at 1570 (citations omitted).
 
 
 12
 With regard to the state interests which must be considered, we note that the Supreme Court has "recognized that, 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.' " Id. at 1569 (quoting Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974)). Specifically, demonstrated support regulations such as the Missouri statute at issue here further the states' "important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in insuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections." Clements v. Fashing, supra, 457 U.S. at 965, 102 S.Ct. at 2844.
 
 
 13
 The Libertarian Party argues that the demonstrated support requirement embodied in section 115.315(4) is constitutionally overburdensome in relation to the above interests which the State is seeking to further. Alternatively, the Party argues that the Missouri statute is constitutionally defective in that it violates the principle of equality amongst voters. This argument is founded on the fact that section 115.315(4) requires that the signatures be obtained from either all, or from at least one-half, of Missouri's nine congressional districts. We shall address each contention in turn.
 
 2. Burden
 
 14
 In Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), the Supreme Court upheld a Georgia statute which required nominees of minor parties and independent candidates to file a petition containing signatures from at least 5 percent of the number of registered voters at the preceding general election for the office in question in order to get on the ballot. As such, it is clear that Missouri's requirement that a party obtain signatures of at least 1 or 2 percent of the votes cast for governor in the last gubernatorial election is not, by itself, unconstitutionally burdensome.[3] See Storer v. Brown, supra, 415 U.S. at 738-39 & n. 10, 94 S.Ct. at 1283 & n. 10 (5 percent of votes cast in last preceding general election not facially unconstitutional).
 
 
 15
 It has been recognized, however, that the entire election scheme must be analyzed to determine whether undue constraints on access to the ballot exist. See, e.g., Mandel v. Bradley, 432 U.S. 173, 178, 97 S.Ct. 2238, 2241, 53 L.Ed.2d 199 (1977) (features of electoral system other than filing deadline, such as period of time to collect signatures and restrictions on pool of potential petition signers, must be considered); Storer v. Brown, supra, 415 U.S. at 738-39, 94 S.Ct. at 1283 (case remanded to analyze effect of 24-day period to collect signatures and effect of reduction of pool of potential signers by disqualification of those who had voted in the primary); Williams v. Rhodes, supra, 393 U.S. at 34, 89 S.Ct. at 12 ("totality of the Ohio restrictive laws taken as a whole" convinced Court to invalidate 15 percent signature requirement); McLain v. Meier, supra, 637 F.2d at 1164 ("facial validity of a signature requirement is but one indication of the constitutionality of a state's access provisions"; early filing deadline convinced court that 3 percent signature requirement was unconstitutional). Considered as a whole, the Missouri election scheme does not place significant burdens on those seeking to obtain a place on the ballot.
 
 
 16
 First, the filing deadline under the Missouri statutes is reasonable. A group seeking to form a new party may file a petition anywhere from the day after the last general election up to the first Monday in August immediately preceding the general election. MO.REV.STAT. Sec. 115.329 (1978). General elections are held on the first Tuesday after the first Monday in November of even-numbered years. MO.REV.STAT. Sec. 115.121(1) (1978). Primary elections are held on the first Tuesday after the first Monday in August of even-numbered years. MO.REV.STAT. Sec. 115.121(2) (1978). Thus, the filing deadline is typically about 91 days before the general election and is usually only a week before the primary election. This filing deadline is not unreasonable, especially compared to the deadlines in other decisions which have been held both permissible and impermissible. See Anderson v. Celebrezze, supra (filing deadline for independent candidates of 229 days in advance of general election unconstitutional); American Party v. White, 415 U.S. 767, 787 n. 18, 94 S.Ct. 1296, 1309 n. 18 (1974) (120 day pre-election deadline for third party nominees not unreasonable or unduly burdensome); Jenness v. Fortson, supra, 403 U.S. at 433-34 & 438, 91 S.Ct. at 1971-72 & 1974 (mid-June filing deadline for third party nominees, which was the same deadline that candidates filing in a party primary were required to meet, was not an unreasonably early filing deadline); McLain v. Meier, supra, 637 F.2d at 1164-65 (June 1st deadline for new political parties, which was 90 days before primary and 150 days before general election, found "particularly troublesome"). Further, the Missouri statutes do not expressly set a time period in which the signatures must be obtained, or set a limit on the number of signatures which can be obtained. See American Party v. White, supra, 415 U.S. at 786, 94 S.Ct. at 1308 (55-day period to gather signatures permissible); Storer v. Brown, supra, 415 U.S. at 726-27 & 739, 94 S.Ct. at 1277-1278 & 1283 (signatures of at least 5 percent, but not more than 6 percent required; 24 days to gather signatures; case remanded); Jenness v. Fortson, supra, 403 U.S. at 438, 91 S.Ct. at 1974 (six-month period to gather signatures permissible).
 
 
 17
 Second, the pool of available petition signers has not been unduly diminished under the Missouri election scheme. Although it is not clear that a registered voter may sign more than one petition to create a new party in the same election, see MO.REV.STAT. Sec. 115.323 (1978), there is no prohibition against registered voters signing a petition even when they have previously voted in another party's primary. See MO.REV.STAT. Sec. 115.313 (1978) (who may sign petitions). See American Party v. White, supra, 415 U.S. at 785, 94 S.Ct. at 1308 (1 percent requirement upheld even though pool of potential signers severely reduced by fact that persons who voted in the just-completed party primary could not sign petition); Storer v. Brown, supra, 415 U.S. at 739, 94 S.Ct. at 1283 (persons who had voted in party primary could not sign petition); Jenness v. Fortson, supra, 403 U.S. at 438-39, 91 S.Ct. at 1974-75 (voters could sign more than one nominating petition and could sign petitions even though they voted in party primary).
 
 
 18
 Third, once a new party meets the Missouri signature requirement, it need do nothing more in order to get its candidates on the ballot. MO.REV.STAT. Sec. 115.317 (1978). See Williams v. Rhodes, supra, 393 U.S. at 36-37, 89 S.Ct. at 13-14 (Douglas, J., separate opinion) (even after meeting signature requirement, new party was required to engage in elaborate primary election machinery to get its candidates on the ballot).
 
 
 19
 Fourth, the Missouri election scheme recognizes independent candidates and write-in votes. MO.REV.STAT. Secs. 115.321, .469 (1978). See Jenness v. Fortson, supra, 403 U.S. at 438, 91 S.Ct. at 1974 (distinguishing Williams v. Rhodes ). Thus, individuals who are not satisfied with the candidates of the major parties may associate politically and have their votes counted for their nominee by pursuing one of three options: forming a new political party, obtaining a place on the ballot for their nominee as an independent candidate, or voting for their candidate through write-in votes. Further, once on the ballot, a new political party may become an "established political party" if any of its candidates for a statewide office receives more than 2 percent of all votes cast for that office. MO.REV.STAT. Sec. 115.317 (1978). Thenceforth, the party would no longer have to meet the signature requirements of section 115.315(4). Thus, the signature requirement is essentially merely a one-time burden for parties which actually have a minimal amount of voter support.
 
 
 20
 Finally, the requirement in section 115.315(4) that the signatures be obtained from either all, or at least one-half, of Missouri's nine congressional districts is not overly burdensome. See Udall v. Bowen, 419 F.Supp. 746, 748-49 (S.D.Ind.), aff'd mem., 425 U.S. 947, 96 S.Ct. 1720, 48 L.Ed.2d 191 (1976) (requirement that 500 signatures be obtained from each of Indiana's 11 congressional districts not unduly burdensome). Where a group seeks to form a political party for an entire state, the state's interest in requiring a "significant modicum of support," Jenness v. Fortson, supra, 403 U.S. at 442, 91 S.Ct. at 1976, naturally extends to a showing of statewide support. The additional burden which is imposed by Missouri's requirement that the signatures be obtained from across the State is balanced by the fact that Missouri's percentage of support requirement (1 or 2 percent) is reasonable and by the other relevant aspects of Missouri's election scheme, summarized above, which are generally favorable to groups seeking to form a new party and secure a place on the ballot.
 
 
 21
 Our conclusion that the Missouri signature requirement embodied in section 115.315(4) is not constitutionally over-burdensome is buttressed by the fact that in practice, Missouri's signature requirement has not proved to be an unreasonable barrier. See Storer v. Brown, supra, 415 U.S. at 742, 94 S.Ct. at 1285 ("Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not.") Since section 115.315(4) was adopted in 1978, three groups, including the Libertarian Party, satisfied the signature requirements embodied in that statute. This is not the track record of an election scheme which is overly burdensome. See American Party v. White, supra, 415 U.S. at 787, 94 S.Ct. at 1309 ("we are thus unimpressed with arguments that burdens like those imposed by Texas are too onerous, especially where two of the original party plaintiffs themselves satisfied these requirements.") Compare McLain v. Meier, supra, 637 F.2d at 1165 (only one third party had fielded candidates over a three decade span of time and that third party found the task of meeting North Dakota's statute to be an "exhausting, even crippling effort").
 
 3. Voter Equality
 
 22
 The Libertarian Party's second argument on appeal is that the requirement in section 115.315(4) that the signatures be obtained from either all, or at least one-half, of Missouri's nine congressional districts violates the principle of equality amongst voters as enunciated in Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). In Moore, the Court held that an Illinois statute which required independent candidates to secure 25,000 signatures in order to get on the ballot was unconstitutional because the statute specified that at least 200 signatures had to be obtained from each of at least 50 of Illinois' 102 counties. The populations of the counties in Illinois were very unequal, as 93.4 percent of the State's registered voters resided in the 49 most populous counties, while only 6.6 percent of the registered voters were residents of the remaining 53 counties. Due to this disparity of population amongst the counties, the application of a "rigid, arbitrary formula [the 200 signatures requirement] to sparsely settled counties and populous counties alike" had the unconstitutional effect of "discriminat-[ing] against the residents of the populous counties of the State in favor of [residents of] rural sections." Id. at 818-19, 89 S.Ct. at 1495-96.
 
 
 23
 The present case is clearly distinguishable from Moore. First, the Missouri statute does not impose a "rigid, arbitrary formula", since Missouri's signature statute utilizes a formula based on a percentage of those who voted in the last gubernatorial race in each district to determine the number of signatures required from each district, rather than utilizing a formula based on a fixed number of signatures. Second, the Missouri congressional districts are virtually equal in population, as the district boundaries were drawn in 1982 by a three-judge court with population equality as a foremost objective, while the populations of the counties in Illinois were not even remotely equal. See Shayer v. Kirkpatrick, 541 F.Supp. 922, 927-29 (W.D.Mo.1982); supra note 2 at 3.
 
 
 24
 In fact, the present case is scarcely distinguishable from Udall v. Bowen, supra, wherein a three-judge district court upheld an Indiana statute which required political candidates to obtain 500 votes from each of Indiana's 11 congressional districts. The court distinguished Moore on the basis that the Illinois counties involved therein were of unequal population, whereas Indiana congressional districts were substantially equal in population. Udall v. Bowen, supra, 419 F.Supp. at 749. The Supreme Court summarily affirmed the district court's decision. Udall v. Bowen, 425 U.S. 947, 96 S.Ct. 1720, 48 L.Ed.2d 191 (1976).
 
 
 25
 We recognize the fact that summary affirmances by the Supreme Court have limited precedential value. As the Supreme Court noted in Anderson, "[w]e have often recognized that the precedential effect of a summary affirmance extends no further than 'the precise issues presented and necessarily decided by those actions.' A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment." Anderson v. Celebrezze, supra, 103 S.Ct. at 1567-68 n. 5 (quoting Illinois Elections Board v. Socialist Workers Party, supra, 440 U.S. at 182, 99 S.Ct. at 989; Mandel v. Bradley, supra, 432 U.S. at 176, 97 S.Ct. at 2240). Even under this narrow standard, however, it appears that the Court's summary affirmance in Udall controls this case.
 
 
 26
 Regardless, after an independent examination, we find ourselves in agreement with the district court's decision in Udall, and find its reasoning applicable here. In essence, since Missouri's congressional districts, like Indiana's congressional districts, are virtually equal in population, no class of voters is discriminated against in any manner.
 
 
 27
 The Libertarian Party argues that the State's use of a formula based on a percentage of votes cast in each district in the preceding gubernatorial election, rather than a percentage of the population of each district, creates an impermissible discrimination amongst voters. The number of votes cast in each district in the gubernatorial elections are not equal. Thus the number of signatures required from each congressional district under the State's percentage formula varies somewhat, despite the fact that the populations of Missouri's congressional districts are virtually equal.
 
 
 28
 The minimal variance which results,[4] however, does not reflect an impermissible discrimination amongst voters. The State's "percentage of votes" formula is a reasonable method of measuring the number of potential petition signers in each district. In fact, the State's formula measures the number of potential petition signers in each district more accurately than a "percentage of population" formula would, since the latter formula fails to reflect the fact that not all residents of a district are registered to vote. Thus, the minimal variances in the number of signatures required from each district which exist under Missouri's formula does not create any impermissible discrimination amongst the voters.
 
 
 29
 In conclusion, we find that section 115.315(4), when considered in tandem with the relevant Missouri election statutes, is neither unconstitutionally burdensome, nor unconstitutionally discriminatory. Accordingly, we affirm the district court's decision.
 
 
 
 *
 The HONORABLE WILLIAM R. COLLINSON, Senior Judge, United States District Court for the Eastern and Western Districts of Missouri, sitting by designation
 
 
 [1]
 This controversy is not moot despite the fact that the 1984 election has already taken place, as the controversy is one that is subject to the "capable of repetition, yet evading review" doctrine. Storer v. Brown, 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974). See McLain v. Meier, 637 F.2d 1159, 1162 n. 5 (8th Cir.1980)
 
 
 [2]
 At the time MO.REV.STAT. Sec. 115.315(4) (1978) was enacted there were ten congressional districts in Missouri. The 1980 census, however, revealed that Missouri's population growth failed to keep up with the national population growth and that the State was entitled to only nine members in the United States House of Representatives. Upon the State's failure to enact an apportionment plan, a three-judge court established an apportionment plan which divided the State into nine congressional districts. Shayer v. Kirkpatrick, 541 F.Supp. 922 (W.D.Mo.1982)
 These events created an ambiguity in section 115.315(4), since nine is not evenly divisible for purposes of the "two percent in one-half" test. In other words, a question exists as to whether one-half of nine is four or five. The Missouri Attorney General has issued an opinion which appears to require that the two percent requirement be met in five congressional districts. Mo.Atty.Gen.Opn. No. 179 at 7, August 22, 1980. Since the Libertarian Party satisfied the two percent requirement in only three congressional districts, we are not faced with the question of whether the Attorney General's opinion is correct.
 Number Number Surplus/
District Obtained Required (Deficiency)
-------- -------- -------- ------------
First 4,214 4,266 (52)
Second 5,702 5,348 354
Third 4,348 5,090 (742)
Fourth 221 4,432 (4211)
Fifth 4,686 4,486 200
Ninth 4,947 4,536 411
 --------
 Total 24,118
 
 
 [3]
 At this point, it is appropriate to clarify the manner in which the strict scrutiny standard of review works in relation to percentage or numerical requirements fixed by the states. The matter was addressed well by the court in Libertarian Party v. Florida, 710 F.2d 790 (11th Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984), as follows:
 Obviously any percentage or numerical requirement is "necessarily arbitrary." American Party of Texas v. White, 415 U.S. at 783, 94 S.Ct. at 1307. Once a percentage or number of signatures is established, it would probably be impossible to defend it as either compelled or least drastic. At any point, probably a fraction of a percentage point less, or a few petitioners less would not leave the interests of the state unprotected. Any numerical requirement could be challenged and judicially reduced, and then again, and again until it did not exist at all. This is not the thrust of the Court's teachings, however. Rather, a court must determine whether the challenged laws "freeze" the status quo by effectively barring all candidates other than those of the major parties, Jenness v. Fortson, 403 U.S. at 439, 91 S.Ct. at 1974, and provide a realistic means of ballot access. American Party of Texas v. White, 415 U.S. at 783, 94 S.Ct. at 1307. The focal point of this inquiry is whether a "reasonably diligent [ ] candidate [can] be expected to satisfy the signature requirements." Storer v. Brown, 415 U.S. at 742, 94 S.Ct. at 1285. Thus, the test is whether the legislative requirement is a rational way to meet this compelling state interest. The least drastic means test becomes one of reasonableness, i.e., whether the statute unreasonably encroaches on ballot access. See Anderson v. Celebrezze, 460 U.S. at 788 & n. 9, 103 S.Ct. at 1570 & n. 9 (1983) (state's important regulatory interests are generally sufficient to justify reasonable restrictions).
 Id. at 793 (emphasis added).
 
 
 [4]
 The insignificant nature of the variances which occur may be seen by comparing the number of signatures required under the two percent in one-half test in each of the six districts in which the Libertarian Party obtained signatures. See ante. at 540 (table)