BRISCOE, Circuit Judge, dissenting.
I respectfully dissent.
In my view, the majority completely misses the point of the plaintiffs' Equal Protection challenge to Amendment 71 and, instead, erroneously concludes that the plaintiffs' "equal protection claim is the same as that of the plaintiffs in" Evenwel v. Abbott, --- U.S. ----, 136 S. Ct. 1120, 194 L.Ed.2d 291 (2016). Maj. Op. at 1140. In fact, the plaintiffs' equal protection claim in this case, as I shall outline in greater detail below, is quite different than the equal protection claim at issue in Evenwel. As a result, and contrary to the majority's conclusion, Evenwel does not govern the outcome of plaintiffs' equal protection claim. Because Amendment 71 requires a petition to be signed by two percent of the registered voters in each state senate district, and because the number of registered voters in each state senate district varies greatly, the result is that the effective weight of a signature varies greatly from one state senate district to another. I therefore agree with the plaintiffs and the district court that Amendment 71 operates to violate the equal protection rights of registered voters in state senate districts with larger numbers of registered voters.
I also disagree with the majority's decision to reach the merits of plaintiffs' First Amendment claims. To the extent we need to address the First Amendment claims, I would remand those claims to the district court for consideration in the first instance.
I
Article V, Section 1(2) of the Colorado Constitution
Article V, Section 1(2) of the Colorado Constitution states, in part, that "[t]he first power hereby reserved by the people is the initiative." Colo. Const. art. V, § 1 (2). This language guarantees to Colorado residents the right of initiative. Article V, Section 1(2) of the Colorado Constitution further states that "signatures by registered electors in an amount equal to at least five percent of the total number of votes cast for all candidates for the office of secretary of state at the previous general election shall be required to propose any measure by petition." Id.
Amendment 71 to the Colorado Constitution
In the general election of 2016, Colorado voters approved Amendment 71 to the Colorado Constitution. Amendment 71 added subsection 2.5 to Article V, Section 1 :
In order to make it more difficult to amend this constitution, a petition for an initiated constitutional amendment shall be signed by registered electors who reside in each state senate district in Colorado in an amount equal to at least two percent of the total registered electors in the senate district provided that the total number of signatures of registered electors on the petition shall at least equal the number of signatures required by subsection (2) of this section. For purposes of this subsection (2.5), the number and boundaries of the senate districts and the number of registered electors in the senate districts shall be those in effect at the time the form of the petition has been approved for circulation as provided by law.
Id. § 1(2.5). This newly added subsection 2.5 thus altered, and expressly purported *1145 to make more difficult, the initiative process for constitutional amendments. Under subsection 2.5, any person or group wishing to place a constitutional amendment on the ballot had to not only satisfy the requirements of Article V, Section 1(2) by obtaining signatures in an amount equal to at least 5% of the total number of votes cast for all candidates for the office of secretary of state at the previous general election, they also had to ensure that the number of signatures collected in each district represented at least 2% of the total registered electors in each state senate district in Colorado.[1]
Plaintiffs' equal protection challenge to Amendment 71
Plaintiffs allege that Amendment 71, and in particular, Section 2.5, violates their rights under the Equal Protection Clause of the Fourteenth Amendment. In support, plaintiffs allege that "Amendment 71 does not involve legislative apportionment and ... does not utilize total district population as the relevant population for purposes of initiative petitions." Aplt. App. at 55. "Instead," plaintiffs allege, "it utilizes a sub-group of the general population-i.e., registered voters-as the population from which signatures are required, and those sub-groups vary enormously in size from [state senate] district to district." Id. In sum, plaintiffs allege that they are asserting "a ballot access" claim that "invokes the one person, one vote rule ... to insure that the signatures of voters in urban districts are not worth less than the signatures of voters in rural districts...." Id. at 55.
The majority's analysis of the equal protection claim
The majority begins its analysis of plaintiffs' equal protection claim by properly acknowledging plaintiffs' theory of the claim: "because only the signatures of registered voters are valid for purposes of citizen-initiative petitions, the number of signatures required to meet the two-percent threshold established by Section 2.5 varies from district-to-district." Maj. Op. at 1139. The majority then proceeds, remarkably, to conclude that "Plaintiffs' equal protection claim is the same as that of the plaintiffs in Evenwel-that the population of either eligible or registered voters, not the total population, in each state senate district must be equal or voting power is diluted." Id. at 1140. Relying exclusively on Evenwel, the majority concludes that "[n]o equal protection problem exists if votes are cast in state legislative districts that were drawn based on Census population data." Id. at 1141. More specifically, the majority concludes that, "[j]ust as it is not unconstitutional to apportion seats in a state legislature based on districts of equal total population, it is not unconstitutional to base direct democracy signature requirements on total population." Id. (citation omitted). And, "[b]ecause there is no dispute that Colorado's thirty-five state senate districts are approximately equal in total population," the majority concludes that "summary judgment must be entered in favor of Defendant on" the plaintiffs' equal protection claim. Id.
*1146 Evenwel is categorically different than the case at hand
In fact, plaintiffs' equal protection claim in this case is nothing like the equal protection claim asserted by the plaintiffs in Evenwel. Evenwel addressed the constitutionality of the method utilized by the State of Texas, and all other states for that matter, of "draw[ing] its legislative districts on the basis of total population," rather than "voter-eligible population." 136 S. Ct. at 1123. The plaintiffs in Evenwel, a group of Texas voters, argued that "[v]oter-eligible population, not total population, ... must be used to ensure that their votes w[ould] not," in violation of the one-person, one-vote rule, "be devalued in relation to citizens' votes in other districts." Id. In the plaintiffs' view, "jurisdictions should design districts based on citizen-voting-age population ... data from the Census Bureau's American Community Survey (ACS), an annual statistical sample of the U.S. population." Id. at 1126. The United States, appearing as amicus, argued in opposition that "[e]qualizing total population ... vindicates the principle of representational equality by ensuring that the voters in each district have the power to elect a representative who represents the same number of constituents as all other representatives." Id. (quotations and brackets omitted).
The Supreme Court agreed with the United States, concluding that "history, precedent, and practice" all established that "it is plainly permissible for jurisdictions to measure equalization by the total population of state and local legislative districts." Id. at 1126-27. In terms of constitutional history, the Court noted that, "[a]t the time of the founding," "the basis of representation in the House [of Representatives] was to include all inhabitants-although slaves were counted as only three-fifths of a person-even though States remained free to deny many of those inhabitants the right to participate in the selection of their representatives." Id. at 1127 (emphasis in original). Later, "[w]hen debating what is now the Fourteenth Amendment, Congress reconsidered the proper basis for apportioning House seats." Id. "The product of these debates was § 2 of the Fourteenth Amendment, which retained total population as the congressional apportionment base." Id. at 1128. As for precedent, the Court noted that, "[c]onsistent with constitutional history," its "past decisions reinforce the conclusion that States and localities may comply with the one-person, one-vote principle by designing districts with equal total populations." Id. at 1130. Those past decisions, the Court noted, recognized the importance of "equality of representation," i.e., " 'equal representation for equal numbers of people.' " Id. at 1131 (quoting Reynolds v. Sims, 377 U.S. 533, 560-561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ). "Moreover," the Court noted, its past decisions "consistently looked to total-population figures when evaluating whether districting maps violate the Equal Protection Clause by deviating impermissibly from perfect population equality." Id. Lastly, as for the "settled practice," the Court noted that "[a]dopting voter-eligible apportionment as constitutional command would upset a well-functioning approach to districting that all 50 States and countless local jurisdictions have followed for decades, even centuries." Id. at 1132. And, the Court concluded, there was "no reason for [it] to disturb this longstanding use of total population" because "representatives serve all residents, not just those eligible or registered to vote." Id.
The case at hand does not concern representational equality
The principle of representational equality, which was critical to the decision in Evenwel, rests on the notion that non-voting *1147 members of the public "have as vital an interest in the legislation of the country as those who actually deposit the ballot," and that, consequently, all members of the public should be represented by an elected official and each elected official should represent an equal number of persons. Id. at 1128 (quotations omitted). In other words, elected officials represent all members of their district, not just the registered voters in that district. Id.
The majority concludes, erroneously in my view, that representational equality is at play in this case. In arriving at this conclusion, the majority begins by suggesting that "[p]laintiffs ... rightly conceded during oral argument in this matter that citizen initiatives and direct democracy do, in fact, implicate the principle of representational equality." Maj. Op at 1141. A careful review of the oral argument recording, however, reveals that plaintiffs' counsel made no such concession. During oral argument in this matter, plaintiffs' counsel argued that signature gathering for initiative petitions "is fundamentally a ballot access issue," and he in turn argued that Evenwel "was not a ballot access case" and was instead "focused on the issue of representational" equality. Oral Argument at 20:11. Plaintiffs' counsel was asked by the panel if it is true that when a person in Colorado signs an initiative proposal, they are acting in a representative capacity for everyone in their district. Plaintiffs' counsel responded: "I don't think so." Id. at 21:05. Plaintiffs' counsel argued that when a person signs an initiative proposal, that is "a personal decision" indicating that that person "personally wants to see this on the ballot." Id. at 21:30. Plaintiffs' counsel was then asked by the panel if it is true that when a person casts a vote or signs a signature relating to a school board measure, they may be taking their own family members' interests into consideration. Plaintiffs' counsel responded: "I suppose to some extent that's true. That if I have a family and they're interested in a school board" issue, "that I'm expressing their interest." Id. at 22:03. Plaintiffs' counsel was then asked by the panel, in light of his response, "Didn't the district court say something diametrically opposed to that," i.e., "that signators do not fulfill any representational" role? Id. at 22:15. Plaintiffs' counsel responded: "It's a different situation from voting for a representative who represents everyone in the district than it is for signing a petition. I think that's categorically different." Id. at 22:29. A panel member responded by stating to plaintiffs' counsel: "You've just conceded something the opposite of what the district court said, that a signator can well have representational interests." Id. at 22:53. Plaintiffs' counsel responded: "You're right." Id. at 23:06.
In my view, this final statement by plaintiffs' counsel was not intended as an abandonment of any of the arguments he made preceding that, nor was it intended as a concession that the case at hand involves the principle of representational equality. Likewise, plaintiffs' counsel's acknowledgment that a signator may, when signing a petition, have in mind the interests of others in no way amounts to a concession that the principle of representational equality is at play here.
Setting aside the purported concession by plaintiffs' counsel, the majority baldly concludes that the citizen initiative process, including the gathering of signatures for petitions, involves the principles of representational equality:
In the direct democracy context, voters are able to directly advance the interests of non-voting members of their families and communities when they decide whether to support a citizen initiative. Although citizens, unlike elected representatives, are not "subject to requests and suggestions" from constituents, *1148 their vote on citizen initiative petitions can be influenced by private discussions with non-voting friends, family, and neighbors. In this way, voting-eligible citizens assume a role similar to that of elected representatives when those voters engage in the initiative process.
Maj. Op. at 1141 (footnote omitted). Notably, but not surprisingly, the majority fails to cite to a single authority of any kind in support of that conclusion. And that is precisely because the conclusion is wrong. When an individual casts a vote or provides a signature, he or she is representing only himself or herself and no one else. Of course, a voter or signator may well have in mind the interests of others when casting a vote or providing a signature. For example, a voter may believe that a particular ballot measure is in the best interests of the people of his or her district or state. But that does not mean that the voter is officially representing anyone else, let alone all of the people in his or her district or state. To conclude otherwise would wreak havoc on our system of elections and, in turn, on the legal framework we have built to address voting-related legal issues. In the case at hand, for example, if a single signator is deemed to represent his or her senate district, then why require any additional signatures in order to assure that a proposed ballot measure carries sufficient support to be placed on the ballot? Or likewise, in terms of voting, why require more than one person in any given senate district to vote on a particular ballot initiative or office?
In the end, I agree with plaintiffs' counsel: a voter or signator represents only himself or herself. As a result, I conclude that the case at hand does not implicate the principle of representational equality and is thus distinguishable from Evenwel.
Did Evenwel completely reject the concept of voter equality?
That leaves one final question regarding the possible impact of Evenwel on this case: did the Court in Evenwel intend to completely reject or abandon the concept of voter equality? In addressing the parties' respective positions regarding what the Equal Protection Clause requires a jurisdiction to do when drawing state and local legislative districts, the Court in Evenwel stated: "we reject appellants' attempt to locate a voter-equality mandate in the Equal Protection Clause." 136 S. Ct. at 1126. Immediately thereafter, the Court explained: "As history, precedent, and practice demonstrate, it is plainly permissible for jurisdictions to measure equalization by the total population of state and local legislative districts." Id. at 1126-27. Later in its opinion, the Court noted that appellants had "extract[ed] far too much from selectively chosen language" in the Court's prior decisions "and the 'one-person, one-vote' slogan." Id. at 1131. The Court further stated: "For every sentence appellants quote from the Court's opinions, one could respond with a line casting the one-person, one-vote guarantee in terms of equality of representation, not voter equality." Id.
In my view, the Court's statements must be cabined to the specific type of dispute that was before it, i.e., a dispute over how a jurisdiction may draw its legislative districts. In other words, I do not believe that it is reasonable to interpret the Court's statements as rejecting or abandoning the concept of voter equality for all contexts and disputes. To conclude otherwise would be to abandon or reject a long line of Supreme Court decisions, some of which arose in contexts other than the drawing of legislative districts, that explicitly recognize the right of individual voters to have their votes weighted equally to all other *1149 voters. It would also mean, in practical terms, that a State could legitimately assign different weights to votes placed in different geographic locations within the State. For example, Colorado could, in terms of its ballot initiative process, require initiative proponents to gather signatures from ten thousand registered voters in each urban state senate district, while requiring initiative proponents to gather signatures from only one hundred registered voters in each rural state senate district.[2] Surely the Court in Evenwel did not intend such a result.
I therefore conclude that Evenwel does not preclude the type of voter equality claim that is being asserted by plaintiffs in this case.
Analysis of plaintiffs' equal protection claim
The Supreme Court has long recognized that the Equal Protection Clause affords individual voters the right to have their votes weighted equally. For example, the Supreme Court's "original one-person, one-vote cases considered how malapportioned maps contract[ed] the value of urban citizens' votes while expand[ing] the value of rural citizens' votes." Gill v. Whitford, --- U.S. ----, 138 S. Ct. 1916, 1935, 201 L.Ed.2d 313 (2018) (Kagan, J., concurring) (quotations omitted). The Court "understood the injury as giving diminished weight to each particular vote, even if millions were so touched." Id. "In such cases, a voter living in an overpopulated district suffered 'disadvantage to [herself] as [an] individual[ ]': Her vote counted for less than the votes of other citizens in her State." Id. (quoting Baker v. Carr, 369 U.S. 186, 206, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ).
In Reynolds, the seminal one-person, one-vote case, the Court "conclude[d] that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators" and that "[d]iluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discrimination based upon factors such as race or economic status." 377 U.S. at 566, 84 S.Ct. 1362 (citations omitted). The Court explained that "[t]he fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote." Id. at 567, 84 S.Ct. 1362. "A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm." Id. at 568, 84 S.Ct. 1362. "This is the clear and strong command of our Constitution's Equal Protection Clause." Id. As a result, "an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living on other parts of the State." Id.
As I previously noted, the Court has recognized this right, i.e., the right of an individual to have his or her vote weighted equally, in contexts other than those involving malapportioned maps. In Gray v. Sanders, 372 U.S. 368, 378, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), for example, the Court considered what it characterized as "only a voting case" arising out of the State of Georgia. At the time the case arose, "Georgia g[ave] every qualified voter one vote in a statewide election; but in counting those votes [the State] employ[ed] the county unit system which in end result weight[ed] the rural vote more heavily than the urban vote and weight[ed] some *1150 small rural counties heavier than other larger rural counties." Id. at 379, 83 S.Ct. 801. In addressing the constitutionality of Georgia's system, the Court openly questioned how "can one person be given twice or 10 times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county?" Id. at 379, 83 S.Ct. 801. The Court in turn held: "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote-whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment." Id.
In Moore v. Ogilvie, 394 U.S. 814, 815, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), the Court considered a declaratory judgment action "brought by appellants who [we]re independent candidates for the offices of electors of President and Vice President of the United States from Illinois." Appellants were challenging "an Illinois statute requiring that at least 25,000 electors sign a petition to nominate such candidates." Id. The statute also required that, in addition to a total of 25,000 signatures, there had to be "signatures of 200 qualified voters from each of at least 50 counties" in the state. Id. Illinois has a total of 102 counties and, at the time of Moore, "93.4% of the State's registered voters reside[d] in the 49 most populous counties, and only 6.6% [we]re resident[s] in the remaining 53 counties." Id. at 816, 89 S.Ct. 1493.
The Court in Moore stated that "[i]t [wa]s no answer to the argument under the Equal Protection Clause that th[e] [challenged] law was designed to require statewide support for launching a new political party rather than support from a few localities." Id. at 818, 89 S.Ct. 1493. The Court concluded that the "law applie[d] a rigid, arbitrary formula to sparsely settled counties and populous counties alike, contrary to the constitutional theme of equality among citizens in the exercise of their political rights. The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." Id. at 818-19, 89 S.Ct. 1493.
The Court in Moore noted that "[u]nder this Illinois law the electorate in 49 of the counties which contain[ed] 93.4% of the registered voters [could] not form a new political party and place its candidates on the ballot. Yet 25,000 of the remaining 6.6% of registered voters properly distributed among the 53 remaining counties [could] form a new party to elect candidates to office." Id. at 819, 89 S.Ct. 1493. The Court concluded that "[t]his law thus discriminate[d] against the residents of the populous counties of the State in favor of rural sections" and therefore "lack[ed] the equality to which the exercise of political rights [w]as entitled under the Fourteenth Amendment." Id.
The Court has also emphasized that this right applies in the context of all elections, including, presumably, initiative petitions. In Hadley v. Junior College District, 397 U.S. 50, 54-55, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), the Court stated that
there is no discernible, valid reason why constitutional distinctions should be drawn on the basis of the purpose of the election. If one person's vote is given less weight through unequal apportionment, his right to equal voting participation is impaired just as much as when he votes for a school board member as when he votes for a state legislator. While there are differences in the powers of different officials, the crucial consideration is the right of each qualified *1151 voter to participate on an equal footing in the election process.
The Court also rejected the notion of courts "distinguishing between various elections," stating that it could not "readily perceive judicially manageable standards to aid in such a task." Id. at 55, 90 S.Ct. 791.
Of course, the Court has recognized that valid state interests can sometimes justify voting-related restrictions. In Jenness v. Fortson, 403 U.S. 431, 432, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), the Court addressed an Equal Protection challenge to a Georgia law that restricted the candidate names on the general ballot to those who had either (a) "enter[ed] and w[o]n a political party's primary election," or (b) had "filed a nominating petition signed by at least 5% of the number of registered voters at the last general election for the office in question." The Court noted that the claim was "necessarily bottomed upon the premise that it [wa]s inherently more burdensome for a candidate to gather the signatures of 5% of the total eligible electorate than it [wa]s to win the votes of a majority in a party primary." Id. at 440, 91 S.Ct. 1970. But the Court rejected that premise, concluding "that from the point of view of one who aspires to elective public office in Georgia, alternative routes are available to getting his name printed on the ballot[,] ... neither of which c[ould] be assumed to be inherently more burdensome than the other." Id. at 440-41, 91 S.Ct. 1970. The Court also concluded that "[t]here [wa]s surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot-the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." Id. at 442, 91 S.Ct. 1970. Although the Court acknowledged that "[t]he 5% figure [w]as ... apparently somewhat higher than the percentage of support required to be shown in many States as a condition for ballot position," it concluded that "this [wa]s balanced by the fact that Georgia ha[d] imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishe[d]." Id.
In Anderson v. Celebrezze, 460 U.S. 780, 782, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the Court addressed "whether Ohio's early filing deadline" for presidential candidates "placed an unconstitutional burden on the voting and associational rights of [petitioner John] Anderson's supporters." The resolution of that specific issue is not particularly relevant to the case at hand. But the manner in which the Court addressed the issue is important. At the outset, the Court recognized that "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." Id. at 786, 103 S.Ct. 1564 (quotations omitted). The Court in turn noted that "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights." Id. The Court also emphasized, however, that "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." Id. at 788, 103 S.Ct. 1564. Indeed, the Court noted that "the state's important regulatory interests" in conducting fair and honest elections "are generally sufficient to justify reasonable, nondiscriminatory restrictions." Id. The Court then proceeded to outline "an analytical process" for addressing "[c]onstitutional challenges to specific provisions of a State's election laws." Id. at 789, 103 S.Ct. 1564. The Court stated that a reviewing court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the *1152 plaintiff seeks to vindicate." Id. The reviewing court "then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Id. In doing so, a reviewing court "must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." Id. "Only after weighing all these factors," the Court stated, "is the reviewing court in a position to decide whether the challenged provision is unconstitutional." Id. Thus, in sum, the Court established a balancing test for resolving Fourteenth Amendment challenges to voting-related laws that the panel in this case must apply.[3] ,[4]
Turning to the case at hand, defendant argues that, "[c]onsistent with recent Supreme Court precedent, Amendment 71 fully respects the one-person, one-vote principle." Aplt. Br. at 22. Defendant argues that, "[a]gainst Evenwel's backdrop, Amendment 71's geographic distribution requirement is fully consistent with the Equal Protection Clause's one-person, one-[vote] principle." Id. at 25. He notes that "Colorado's 35 state senate districts are approximately equal in total population, deviating no more than five percent between the most populous and the least populous district." Id. at 25-26. He argues that "[t]his is well within the presumptively permissible range established by the Supreme Court's precedent." Id. at 26. "At bottom," defendant argues, "if Evenwel's total-population framework is adequate to protect the right to vote-a fundamental right-it is more than adequate to protect the lesser state-created right to sign an initiative petition." Id. In other words, defendant argues, "[t]he Equal Protection Clause cannot logically demand different or more stringent protections for petition signers than it does for actual voters." Id.
*1153 The chief problem with defendant's arguments, aside from being grounded on Evenwel, is that they ignore the fact that Amendment 71 does not rely solely on a total-population framework in imposing its 2% petition requirement.[5] To be sure, Amendment 71 makes a passing nod to total-population figures by requiring that a petition for an initiated constitutional amendment contain signatures from each state senate district in Colorado. But that is where its reliance on total-population figures ends. Amendment 71 then shifts course and mandates that the required signatures come not simply from residents of each state senate district, but rather from "registered electors" in each state senate district. And that is where the problem in this case lies. As the record establishes, there are significant variances in registered electors from one state senate district to another. And those variances in numbers of registered electors effectively undercut defendant's reliance on the relatively equal total population figures.
In the district court, defendant agreed that in 2012, Colorado's thirty-five state senate districts had total resident populations that varied from 140,096 to 147,272, but total voter registration numbers that varied from a low of 70,746 (Senate District 21) to a high of 128,777 (Senate District 31). Aplt. App. at 114-15. Defendant further agreed that as of February 22, 2018, the total voter registration numbers for the thirty-five state senate districts varied from a low of 82,477 (Senate District 21) to a high of 133,727 (Senate District 23), for a total variance of 44.41%. Id. at 115-16. Thus, for 2012, the total resident populations of the state senate districts varied only 4.98%, but the total voter registration numbers varied by 58.17%.[6] For 2018, the total voter registration numbers varied by 47.41%.
These variances mean that voters who reside in state senate districts with the lowest numbers of total voters effectively wield greater power in determining whether initiated constitutional amendments make it onto the ballot. And, conversely, voters who reside in state senate districts with the highest numbers of total voters effectively wield less power in these determinations. For example, using the 2012 figures outlined above, only 1,415 registered voters in State Senate District 21 would have needed to sign a petition in order to satisfy Amendment 71's 2% requirement, whereas 2,576 registered voters in State Senate District 31 would have needed to sign the same petition. Similarly, using the 2018 figures outlined above, only 1,650 registered voters in State Senate District 21 would have needed to sign a petition in order to satisfy Amendment 71's 2% requirement, whereas 2,708 registered voters in State Senate District 23 would have needed to sign the same petition. In other words, using these same examples, in 2012, 1,415 voters in State Senate District 21 would have wielded the same political power as 2,576 voters in State Senate District 31. In 2018, 1,650 voters in State Senate District 21 would have wielded the same political power as 2,708 voters in State Senate District 23. Thus, in terms of voter equality, Amendment 71 is constitutionally problematic.
Defendant argues, however, that "[f]ederal court precedent uniformly upholds *1154 laws like Amendment 71 that impose geographic distribution requirements on signature-gathering." Aplt. Br. at 27. But an examination of the four cases cited by defendant reveals that they are either distinguishable from the case at hand or, in one instance, flawed. In Angle v. Miller, 673 F.3d 1122, 1126-27 (9th Cir. 2012), the first of those four cases, the Ninth Circuit upheld a challenge to a provision of the Nevada Constitution that required initiative proponents to obtain "signatures from a number of registered voters equal to 10 percent of the votes cast in the previous general election," and to also "meet the 10 percent signature threshold in each of the state's congressional districts." In doing so, the Ninth Circuit relied on the principle "that geographic distribution requirements are permissible for signature collection, so long as they involve districts with equal populations." Id. at 1131. Notably, however, the plaintiffs in that case did not argue that variations in registered voter populations in each congressional district resulted in an Equal Protection violation, and in turn did not present any evidence of what the registered voter populations were in each congressional district. Thus, the case is distinguishable from the case at hand.
Two of the cases cited by defendant involved challenges to laws that, unlike Amendment 71, required a specified number of signatures from each equally-populated district, rather than, as in the case at hand, a specified percentage of signatures from registered voters in each district. See Libertarian Party of Va. v. Davis, 766 F.2d 865, 868 (4th Cir. 1985) (upholding a Virginia law requiring minor-party presidential candidates to submit signatures from 200 voters in each of the state's 10 congressional districts to gain a place on the ballot), recognized as abrogated on other grounds in Lux v. Judd, 651 F.3d 396 (4th Cir. 2011) ; Udall v. Bowen, 419 F. Supp. 746, 749 (S.D. Ind. 1976) (upholding an Indiana law requiring presidential candidates, in order to be placed on the primary ballot, to submit 500 signatures from each of the state's 11 congressional districts). Clearly, the laws at issue in these two cases-because they rely on specified numbers of signatures rather than percentages of registered voters in each district-would not present the same problems as Amendment 71.
In the fourth and final case cited by defendant, Libertarian Party v. Bond, 764 F.2d 538 (8th Cir. 1985), the Eighth Circuit upheld a challenge to a Missouri law governing the formation of new political parties. The challenged law permitted the formation of a new political party if that party filed a timely petition (a) containing signatures from each state congressional district equal to "at least one percent of the total number of votes cast in the district for governor in the last gubernatorial election," or (b) signed "by the number of registered voters in each of one-half of the several congressional districts which [wa]s equal to at least two percent of the total number of votes cast in the district for governor at the last gubernatorial election." Mo. Rev. Stat. § 115.315(4) (1978). In upholding this law, the Eighth Circuit noted, in pertinent part, that "the Missouri congressional districts [we]re virtually equal in population, as the district boundaries were drawn in 1982 by a three-judge court with population equality as a foremost objective." Bond, 764 F.2d at 544. Notably, the plaintiff also argued "that the State's use of a formula based on a percentage of votes cast in each district in the preceding gubernatorial election, rather than a percentage of the population of each district, create[d] an impermissible discrimination amongst voters." Id. (emphasis in original). But the Eighth Circuit rejected this argument on the grounds that "[t]he minimal variance [that] result[ed] ... d[id] not reflect an impermissible discrimination amongst voters." Id.
*1155 In reaching this conclusion, the court cited to a table outlining the number of votes that the law required in each of the nine state congressional districts. Id. at 544 n.4. Those numbers ranged from 4,266 signatures to 5,348 signatures. Id. at 539 n.2. There is no indication, however, that the Eighth Circuit calculated the variance (which was approximately 22.5%). Instead, it appears that the Eighth Circuit's "minimal variance" comment/rationale was based solely on the raw numbers. And, to the extent that the Eighth Circuit silently calculated and relied on the true variance of 22.5%, it made no attempt to explain why it considered this variance "minimal," particularly in light of existing Supreme Court precedent. Consequently, any conclusion that the variance of 22.5% was "minimal" was erroneous.
For these reasons, I think it is apparent that Amendment 71 violates plaintiffs' right to have their votes weighted equally to all other voters in Colorado. Under the analytical framework outlined by the Supreme Court in Anderson, however, it is still necessary to balance the harm that Amendment 71 does to plaintiffs' Fourteenth Amendment rights against "the precise interests put forward by the State as justifications for the burden imposed by its rule." Anderson, 460 U.S. at 789, 103 S.Ct. 1564. Unfortunately, defendant makes no mention of this analytical step in his appellate brief, nor does he expressly challenge the district court's analysis of this step.
Out of an abundance of caution, I will nevertheless proceed to review the interests that have been forwarded by defendant as justifications for the burden imposed by Amendment 71. In his appellate brief, defendant notes that prior to Amendment 71, "an initiative proponent seeking to amend the state constitution could place an initiative on the statewide ballot by satisfying modest requirements that were among the loosest in the country." Aplt. Br. at 6-7. Defendant further notes that "[b]efore Amendment 71, rural citizens had almost no voice in determining which measures appeared on the ballot, due to the relative ease of collecting signatures in heavily populated urban areas compared to sparsely populated rural areas." Id. at 9. Amendment 71, defendant asserts, "was enacted to ensure that citizens from across Colorado's diverse geographical regions all have input into which measures are placed on the statewide ballot." Id. "Amendment 71," defendant asserts, was also "designed to strengthen the process for changing Colorado's constitution." Id. Thus, he asserts, "Amendment 71 was meant to make the state constitution more stable and to spur increased citizen use of the statutory initiative process." Id. at 10.
These are, without question, valid state interests. But defendant does not argue that these interests outweigh the harm caused to plaintiffs' voting rights by Amendment 71. Indeed, defendant denies that Amendment 71 results in any violation of plaintiffs' rights. More importantly, the significance of the variances that result from Amendment 71's reliance on registered voter signatures convinces me that Amendment 71 cannot survive analysis under the balancing test in any event.
I note, as a final matter, that Amendment 71 could be easily revised to eliminate the Equal Protection problem that results from its reliance on percentages of registered voters from each state senate district. For example, if Amendment 71 continued to require signatures from registered voters in each state senate district but required a set number of those signatures from each state senate district, that would seemingly eliminate the problem outlined above.[7]
*1156 In conclusion, I agree with the district court that Amendment 71 effectively imposes a significant burden on plaintiffs' Equal Protection rights, and that this burden is not justified by the State's interests cited by defendant, particularly given the fact that Amendment 71 is susceptible to revisions that would wholly eliminate the Equal Protection problem. See generally Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 190, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (plurality opinion) (discussing application of the balancing test). I therefore vote to affirm the district court's entry of summary judgment in favor of plaintiffs on their equal protection claim.
II
Plaintiffs' First Amendment claims
The majority also addresses and rejects on the merits the two First Amendment claims that were alleged by plaintiffs in their complaint, but that were never addressed by the district court. Because the district court did not address the First Amendment claims at all, I believe that the proper course of action would be to remand the case to the district court for consideration of those claims in the first instance.

Amendment 71 also added a supermajority requirement for ultimate approval of the proposed constitutional amendment:
In order to make it more difficult to amend this constitution, an initiated constitutional amendment shall not become part of this constitution unless the amendment is approved by at least fifty-five percent of the votes cast thereon; except that this paragraph (b) shall not apply to an initiated constitutional amendment that is limited to repealing, in whole or in part, any provision of this constitution.
Colo. Const. art. V, § 1 (4)(b); see also id., art. XIX, § 2(1)(b) (adding the same requirement to constitutional amendments originating in the Colorado state legislature).

Although this example may seem extreme in terms of numbers, it is, in effect, what the State of Colorado is currently doing by requiring the same percentage of signatures from state senate districts with varying numbers of registered voters.

At times, the Court has also required strict scrutiny of challenged voting-related laws. In Campbell v. Buckley, 203 F.3d 738, 745 (10th Cir. 2000), this court reviewed Supreme Court precedent and attempted to outline when a court must apply the balancing test and when a court, instead, must apply strict scrutiny. In particular, this court noted that "strict scrutiny is applied where the government restricts the overall quantum of speech available to the election or voting process." Id. That appears to be consistent with Supreme Court precedent. See McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 344-45, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (applying strict scrutiny to law that did not "control the mechanics of the electoral process," but instead was a pure regulation of speech). Under that framework, this court would apply the balancing test, rather than strict scrutiny, in examining Amendment 71.

The majority suggests that Anderson's balancing test cannot be applied in this case because the case "was resolved on a motion to dismiss" and the record does not contain sufficient evidence to allow us to properly conduct that test. Maj. Op. at 1139-40 n.8. That is, however, an inaccurate characterization of both the procedural history of this case and of the record on appeal. The district court actually denied defendant's motion to dismiss the complaint and, in doing so, ordered defendant to show cause why final judgment should not enter in favor of plaintiffs. Defendant filed a response and objection to the district court's show cause order. Aplt. App. at 99. That response specifically addressed the Anderson balancing test and argued that it favored the defendant. Id. at 104-108. The response also included and referenced multiple declarations, including two that discussed total population and registered voter data for all thirty-five Colorado counties for the years 2012 and 2018. Plaintiffs filed a written response to defendant's response and objection. Notably, plaintiffs did not object to or otherwise dispute the total population and registered voter data that was submitted and cited by defendant. Thus, contrary to the majority's assertion, there is, in fact, undisputed evidence in the record regarding the total population and registered voter figures for each Colorado state senate district. Moreover, the parties discussed the Anderson test at length in their district court pleadings.

It simply cannot be the case, as defendant argues, that Evenwel effectively immunizes from Equal Protection challenges any voting-related law that relies in part on districts with equal total populations.

These variances were calculated using the following steps for each set of figures: (1) subtract the lowest figure from the highest to arrive at A; (2) add the lowest figure and the highest figure and then divide that total by 2 to arrive at B; (3) divide A by B, then multiply that result by 100 to arrive at the percentage.

The Denver Metro Chamber of Commerce (DMCC), in its amicus brief, argues that the district court "should have followed Colorado [state law] interpretive guidelines and at least considered alternatives to invalidating the entirety of [Amendment 71's] statewide support requirement." Br. of Denver Metro Chamber of Commerce at 7. In particular, DMCC argues that the district court could have stricken "the word 'registered' from subsection 2.5 of Amendment 71," thus making it necessary only for signatures to come from qualified voters. Id. at 7-8. That change alone, DMCC argues, could have alleviated the potential Equal Protection problems posed by the "registered voter" signature requirement. It may well be true that this alteration, standing alone, could have alleviated the problems with Amendment 71. The problem, however, is that defendant never made this argument below, i.e., he never asked the district court to take this action (nor has he made the argument on appeal). Further, and relatedly, there is no evidence in the record regarding the numbers of qualified voters in each state senate district. Thus, it is impossible to determine whether this measure would actually alleviate the Equal Protection problem outlined above.